## STEPHENSON v. GRAND TRUNK WESTERN R. CO. (two cases).
### Nos. 6982, 6983.

Circuit Court of Appeals, Seventh Circuit.

Feb. 23, 1940.

Rehearing Denied April 1, 1940.

Writ of Certiorari Granted June 3, 1940.

Douglas C. Moir, George B. Christensen, and William C. Mulligan, all of Chicago, Ill. (Winston, Strawn & Shaw, of Chicago, Ill., of counsel), for appellant.

Leslie H. Vogel, John R. Whitman, and DeForest P. Davis, all of Chicago, Ill., for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

These appeals are from judgments awarding damages in actions predicated upon the wrongful death of the plaintiff's intestates, her husband and infant son. The cases were commenced separately, consolidated for trial in the lower court and are joined in this appeal by stipulation of the parties.

Plaintiff's husband, Bart A. Stephenson, and their ten year old son, Stuart B. Stephenson, were killed in a collision between defendant's train and the Ford automobile in which they were riding. The collision occurred on October 15, 1937, at about 12:30 A. M. on Capitol Avenue (Michigan Highway 67) in Battle Creek, Michigan, where the avenue intersects the two-track main line of defendant's railroad approximately at right angles.

At the time of the collision, Stephenson, accompanied by his son, was driving his car in a southerly direction along Capitol Ave-

nue. Defendant's passenger train No. 14 was traveling in an easterly direction toward the Battle Creek station, which is located about five blocks east of Capitol Avenue. The train, carrying eight cars, of which three were Pullmans, had come from Chicago and was scheduled to make a regular stop at Battle Creek at 12:25 A. M. Battle Creek, a division point of defendant's railroad, has a population of between 45,000 and 47,000.

Complaints were filed in the District Court of the United States for the Northern District of Illinois, Eastern Division. Numerous acts of negligence were charged, which will be discussed in subsequent paragraphs, and in connection therewith, a statement of the evidence relative thereto.

The contested issues to summarize, contend (1) that the District Court had no jurisdiction to hear or try the issues since the laws of the State of Illinois prohibited the bringing of such actions in the courts of this state and the "Rule of Decision Act" requires the Federal Courts in this state to adopt a similar rule, (2) that the verdict in each case is against the manifest weight of the evidence. (In this connection, it is argued that the defendant was guilty of no negligence and, that Stephenson, the driver of the automobile, was guilty of contributory negligence), (3) that the court erred in submitting the cause to the jury on counts of the complaint concerning which there was no supporting evidence, (4) that there was erroneous admission of testimony, (5) that counsel for the plaintiff was guilty of prejudicial misconduct, and (6) that the court erred in its charge to the jury.

We first shall consider the jurisdictional question. The Illinois Statute (Revised Stat.1937, Ch. 70, § 2) creating a cause of action for death resulting from a wrongful act, contains the following proviso: "Provided, further, that no action shall be brought or prosecuted in this State to recover damages for a death occurring outside of this State where a right of action for such death exists under the laws of the place

where such death occurred and service of process in such suit may be had upon the defendant in such place."

The language "no action shall be brought or prosecuted in this state to recover damages for death occurring outside of this state" was enacted as an amendment in 1903 and the remainder of the proviso by amendment of 1935. The Supreme Court of Illinois has construed this proviso to forbid the bringing or the prosecution of any action in the State of Illinois to recover damages for a death by wrongful act occurring outside the state. [1]

It is defendant's contention that the state thus having established its public policy in this respect, a federal court sitting in the state is bound thereby. In other words, that the law of Illinois which precludes its own courts from taking jurisdiction, likewise precludes the federal court. Plaintiff, in meeting this contention, relies upon Section 24(1) of the Judicial Code, U.S.C.A., Title 28, Section 41(1), which provides:

"The district courts shall have original jurisdiction as follows:

"First. Of all suits of a civil nature, at common law or in equity * * * where the matter in controversy exceeds * * * the sum or value of $3,000, and * * * is between citizens of different States * * *."

We do not think defendant's contention in this respect is tenable. True, there is some contrariety of expression in the decisions, but it is apparent that none goes to the extent of holding that the public policy of a state can deprive a federal court of jurisdiction because it sits therein. It would serve no good purpose for us to analyze the various authorities relied upon by the parties. We assemble in a footnote some of those relied upon by the defendant [2] as well as those relied upon by the plaintiff. [3]

While it is true there is some support in the authorities for the proposition that the courts of one state will not take jurisdiction of a cause of action arising in

---

[1] Wall v. Chesapeake & Ohio R. Co., 290 Ill. 227, 125 N.E. 20; Dougherty v. American McKenna Co., 255 Ill. 369, 99 N.E. 619, L.R.A.1915F, 955, Ann.Cas. 1913D, 568.

[2] Stewart v. Baltimore & Ohio Railroad Co., 168 U.S. 445, 448, 18 S.Ct. 105, 42 L.Ed. 537; Texas & Pacific Railway Co. v. Cox, 145 U.S. 593, 604, 12 S.Ct.

905, 36 L.Ed. 829; Gallagher v. Florida East Coast R. Co., D.C., 196 F. 1000, 1001.

[3] Chicago & N. W. Railway Co. v. Whitton, 80 U.S. 270, 286, 20 L.Ed. 571; Dennick v. R. R. Co., 103 U.S. 11, 17, 26 L.Ed. 439; Missouri Pac. Ry. Co. v. Larussi, 7 Cir., 161 F. 66, 68; St. Bernard v. Shane, 6 Cir., 220 F. 852.

another state, when to do so would violate the former's public policy, we do not think that such public policy has been or can be directed at a federal court upon a matter of jurisdiction. In the early case of Chicago & N. W. Railway Company v. Whitton, 80 U.S. 270, 20 L.Ed. 571, the court was construing a state statute which confined jurisdiction exclusively to the state court. In discussing whether this provision deprived the federal court of jurisdiction, the court, 80 U.S. on page 286, 20 L.Ed. 571, said: "* * * In all cases, where a general right is thus conferred, it can be enforced in any Federal court within the State having jurisdiction of the parties. It cannot be withdrawn from the cognizance of such Federal court by any provision of State legislation that it shall only be enforced in a State court. * * *"

In the instant suit, there is no question raised as to diversity of citizenship, or the requisite amount Congress has conferred upon the District Courts of the United States.

█ It must be remembered that jurisdiction of federal courts is solely a matter of congressional bestowal, and not subject to limitation by any other governmental agency. As was said in Barrow Steamship Co. v. Kane, 170 U.S. 100, 111, 18 S.Ct. 526, 530, 42 L.Ed. 964: "The jurisdiction so conferred upon the national courts cannot be abridged or impaired by any statute of a state. * * *"

In that case it was argued that the jurisdiction of the federal court sitting in New York was contingent upon action by the Legislature of the state. In disposing of such contention, the court, 170 U.S. on page 112, 18 S.Ct. at page 530, 42 L.Ed. 964, said: "* * * The action was within the general jurisdiction conferred by congress upon the circuit courts of the United States. The fact that the legislature of the state of New York has not seen fit to authorize like suits to be brought in its own courts by citizens and residents of other states cannot deprive such citizens of their right to invoke the jurisdiction of the national courts under the constitution and laws of the United States."

Again, in Penn General Casualty Co. v. Pennsylvania, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850, the court had before it a jurisdictional question, and while the facts are foreign to those in the instant case, yet we think an applicable rule is announced. On page 197 of 294 U.S., 55 S.Ct. at page 390, 79 L.Ed. 850, the court said: "* * * Its authority as a federal court to entertain the suit is not restricted by the procedure established by local statutes for the liquidation of insurance companies. The jurisdiction conferred on the District Courts by the Constitution and laws of the United States cannot be affected by state legislation. * * *"

Defendant argues that the decision in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, requires a federal court to follow a state policy as expressed in legislative enactment, or the decisions of its courts. We do not think this case has any application, even though the court was considering the construction to be given section 34 of the Federal Judiciary Act, 28 U.S.C. § 725, 28 U.S.C.A. § 725. The gist of that opinion is found in the statement of the court on page 78 of 304 U.S., 58 S.Ct. at page 822, 82 L.Ed. 1188, 114 A.L.R. 1487: "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. * * *"

It will be observed that "matters governed by the Federal Constitution or by Acts of Congress" are excepted, as might be expected. It also was pointed out on the following page, 304 U.S. at page 79, 58 S.Ct. at page 822, 82 L.Ed. 1188, 114 A.L.R. 1487: "* * * Supervision over either the legislative or the judicial action of the states is in no case permissible except as to matters by the constitution specifically authorized or delegated to the United States. * * *"

█ If Congress or the federal courts have no power of supervision over the state, when acting through its Legislature or its courts, it must be equally true that the latter is without power of control or supervision over the federal courts. That which was held in the Tompkins case must be confined, we think, solely to matters of substance and not of jurisdiction. To hold otherwise would lead to the illogical conclusion that the jurisdiction of federal courts not only may be limited, but abrogated by the edict of the state Legislature or decision of the Supreme Court of the

state in which the federal court sits. We assume that the state has the power to determine the jurisdiction of its own courts as it sees fit, but it does not follow that likewise it may determine the jurisdiction of a federal court under the theory that the latter is required to follow the public policy of the former.

Having determined that the court properly assumed jurisdiction of the cause, we now shall consider defendant's contention that the verdict is against the manifest weight of the evidence. This involves an analysis of the testimony and circumstances surrounding the collision with a view of determining whether or not there is substantial evidence to sustain the charge as made in the complaint, and if an affirmative conclusion be reached with respect thereto, whether or not plaintiff's deceased was guilty of contributory negligence. In this connection it seems important to relate the instances of alleged negligence. Paragraph 9 of the complaint [4] contains Subsections A to L, inclusive, each of which sets forth a charge of negligence. Subsections A, D, E, F and I were withdrawn and need not be considered. Subsection B charges the defendant with neglect in driving its engine at an unreasonable, dangerous and unsafe rate of speed; C, failure and neglect to ring any bell, blow any whistle or sound any warning upon approaching the crossing; G, a failure to lower the crossing gates; H, a failure to ring the crossing signal bell; J, failure and neglect to provide and maintain sufficient signs and other devices for the purpose of warning persons traveling along and upon the said public highway of the intersection of the defendant's railroad with the said public highway; K, carelessness and negligence in driving and managing its said engines and cars as to cause the collision; and L, negligence in and improper maintenance and operation of its said railroad and crossing so as to cause the collision.

Prior to our discussion of the facts and circumstances, it seems pertinent to dispose of another contention made by the defendant—namely, that a failure to prove negligence under each count submitted to the jury is fatal error. In other words, it is argued by defendant that if there is a single charge of negligence, submitted to the jury, unsupported by substantial evidence, a reversal is required even though other charges of negligence may find substantial support. This question was preserved properly by motions for directed verdicts and by instructions tendered and denied as to each charge of negligence.

It is plaintiff's position that this is a matter of practice and that we are bound by the rule as announced by the Supreme Court of Illinois. Defendant argues to the contrary and maintains that we must follow the decision in Wilmington Star Mining Co. v. Fulton, 205 U.S. 60, 27 S.Ct. 412, 51 L.Ed. 708. Unquestionably that case lays down the rule that a verdict upon counts of a declaration, some of which have not been supported by evidence, must be set aside on the theory that it is impossible to say upon which of the counts the verdict was based. The case originated in Illinois, but the opinion makes no mention of the Illinois rule except to distinguish a section of the Illinois Practice Act as it then existed, relied upon by the plaintiff in that case, and holds it inapplicable. Other cases called to our attention are Erie R. Co. v. Gallagher, 2 Cir., 255 F. 814, and Chicago, St. P. M. & O. R. Co. v. Kroloff, 8 Cir., 217 F. 525. These cases, however, did not originate in Illinois and have no application, provided the Illinois rule is controlling. Prior to the decision in the Wilmington case, the court in Bond v. Dustin, 112 U.S. 604, 5 S.Ct. 296, 28 L.Ed. 835, clearly recognized that federal courts are bound to follow a state statute in a similar matter. In that instance the declaration contained common and special counts. It was contended that the special counts failed to set forth a cause of action. The court, on page 609 of 112 U.S., 5 S.Ct. at page 299, 28 L.Ed. 835, referring to an Illinois statute, said: "* * * That statute governs proceedings in cases tried in the federal courts within that state. * * * As the common counts in this declaration are indisputably good, the sufficiency of the special counts need not be considered."

The Wilmington case was decided March 4, 1907, and on June 29, 1910, the Supreme Court of Illinois, in Scott v. Parlin & Orendorff Co., 245 Ill. 460, 92 N.E. 318, decided what seems to have been the identical question with which we are here

---

[4] This refers to the complaint in 6982. The allegations with reference to negligence in 6983 are substantially the same, and require no separate consideration.

presented, and contrary to defendant's contention. The court had before it a general verdict based upon a declaration, some of the counts which, admittedly, had not been sustained by proof. The question there, as here, appropriately was raised in the trial court. It was held that one good count supported by evidence was sufficient to sustain a general verdict, notwithstanding lack of proof in support of other counts. The rule announced in the Scott case was followed in Schwartz v. Lindquist, 251 Ill. App. 320, on page 327, where the court said: "The settled rule in this State is that the plaintiff may charge different acts of negligence in different counts of his declaration and is entitled to recover if the evidence supports any one good count. This is true even though the court erroneously denies a motion to take from the jury counts of the declaration which are not supported by the evidence. * * *"

Both sides rely upon the decision of this court in Firemen's Ins. Co. v. Follett, 7 Cir., 72 F.2d 49, and while language used in that case may lend support to either side, it would serve no good purpose for us to undertake an analysis of the opinion. The important thing about the opinion is, it clearly recognizes that federal courts are bound by the law of the state. It may be, as argued by the defendant, that later decisions in Illinois [5] have criticized the rule, but in any event it has not been overruled and so far as we are aware, is now the established rule of practice.

Thus, we face opposing rules and must decide whether to follow that set forth in the Wilmington case, or the one as announced by the Supreme Court of Illinois, and we conclude that the latter is controlling. It is our judgment that the question involved is one of practice or procedure, in which the statute or decision of the state court must be followed. We think we are justified in refusing to follow the court in the Wilmington case because the Supreme Court of Illinois, so far as the court's opinion discloses, had not decided the question at that time and because the subsequent decision of the state court renders the rule announced in the Wilmington case inapplicable.

While we shall examine all the charges of negligence, we shall do so with a view of ascertaining if any of such charges is supported by substantial evidence, rather than if all are so supported.

Before doing so, however, it seems essential to set forth more of the details, including the circumstances and conditions surrounding the point at which the fatal collision occurred. As heretofore stated, plaintiff's husband, Bart A. Stephenson, and their ten year old son, Stuart B. Stephenson, were traveling in a southerly direction on Capitol Avenue in the City of Battle Creek, Michigan, on October 15, 1937, and the collision with defendant's passenger train occurred about 12:30 A. M. Defendant's railroad at this point extended east and west and intersected the avenue substantially at a right angle. Defendant's train approached the highway from the west, and the intersection in question was four or five blocks west of the Battle Creek station at which the train was scheduled to stop at 12:25 A. M. The crossing at which the collision occurred is located in a rather closely built-up business and industrial district. On the west side of the avenue, and adjacent to the railroad (to decedent's right as he approached the crossing) is defendant's two-story brick freight house, while on the opposite side of the avenue (to decedent's left) is a factory building more than a block in length. South of the railroad and on each side of the avenue are buildings of various kinds. At the highway intersection there are three tracks. The first, as one approaches the crossing from the north, is a team track, the second, the west bound main, and the third, the east bound main— the track upon which the train was traveling at the time of the collision.

At the time of the accident two or more box cars were on this team track just west of the avenue and at the side of the freight house. The distance from the track upon which these cars were standing, to the west bound main, was 13 ft. 2 ins., and to the east bound main, upon which the train was traveling, 26 ft. 4 ins. There was a switch track which, it appears, intersected the highway at an angle 90 feet north of the east bound track and north of the freight house. In other words, the freight house was located between this switch and the main tracks. The crossing was protected by standard railroad crossing gates, four in number, two on each side of

[5] Smithers v. Henriquez, 368 Ill. 588, 598, 15 N.E.2d 499; Gore v. O'Keefe Bros. Co., 280 Ill.App. 163, 167.

the crossing. They were operated by a watchman from a tower located east of the avenue and north of the railroad. There were two electrically operated crossing bells, one located on the side of the tower and the other' on the tower support and near the ground. On each gate, near the center of the traffic lane, was a 6-inch red lamp, lighted with an electric bulb. In addition, the northwest and southwest gates were equipped with red reflectors. There was a street arc light hanging about 30 feet from the ground at or near the crossing.

Plaintiff's intestate, Bart A. Stephenson, was 39 years of age, had been employed by the Sinclair Refining Company since 1927, and at the time in question was receiving a salary of $200 per month; had a family consisting of his wife and three children, including Stuart B. Stephenson, a son ten years of age, who was with him and who was killed in the collision. It was a cold, frosty night and they were returning to their home in Chicago. He was not familiar with the crossing in question. A few minutes before the collision, the occupants of the car stopped at a restaurant which was about two miles north of the crossing. There is no testimony concerning them from that point until immediately prior to the collision. It seems to be undisputed that the automobile collided with the engine, was caught on some part of the train and dragged to the east, a distance of 200 feet or more. The train travr'led 779 feet after the collision before coming to. a stop. There were marks on the pavement extending from a point even with the gate toward the tracks and to the left.

■ We do not believe there is any substantial evidence in support of the charge that the train was being operated at an unreasonable and dangerous rate of speed, as charged in Subsection B. Plaintiff's argument in this respect is based largely upon the distance traveled by the train before it was brought to a stop. Just how this circumstance alone would prove, or tend to prove, an unreasonable rate of speed, we are unable to comprehend. To a person who was experienced in the operation of a train of that kind and character, it might have some weight, but to a jury, who we assume had no special knowledge, it could mean little, if anything. Defendant had seven witnesses who were questioned on this point and their opinions as to the train's speed varied from 15 to 25 miles per hour. The fact that the station at which the train was to stop was only a distance of four blocks beyond Capitol Avenue, furnishes rather strong support to defendant's witnesses in this respect. Assuming that the speed was 25 miles per hour, we do not think it would substantiate the charge.

■ Subsections C. and H. are similar. The negligence complained of in the former is that no bell was rung, no whistle blown, nor warning sounded; and the latter charges a failure to ring the crossing signal bell. Neither do we think the evidence supports these charges. Plaintiff, in this respect, relies wholly upon the testimony of two witnesses, Ausberger and White. The former was approaching the crossing in an automobile from the south, accompanied by a Mrs. Reynolds (defendant witness) and was about one-half block from the crossing at the time of the collision. He testified: "I didn't hear any bell sounded. It was a pretty cold, frosty night. The windows in my car were closed. I didn't hear any whistle that night. I was not anticipating a train." The witness White was defendant's flagman in the fourth car of the train from the engine as it approached the crossing. He testified: "I couldn't hear any signals." Four witnesses testified for the defendant that the automatic engine bell was ringing, and two witnesses that the crossing bells were on. Such testimony does not present a conflict,—it may all be true. Pere Marquette R. Co. v. Anderson, 7 Cir., 29 F.2d 479. Testimony of a witness that he did not hear, without any proof that he was listening and in a position to hear, can carry no weight, especially in the face of positive and direct evidence to the contrary.

■ Subsection G. charges a failure to lower the crossing gates. Here again plaintiff relies heavily upon the testimony of Ausberger. As stated already, he was approaching the crossing from the south. He said: "I didn't see no gates down." He continued driving toward the crossing and went across after the train had passed. Ausberger continued: "There were no gates down then." After he crossed the crossing, defendant's tower man, Brandimore, came to Ausberger's car and the record shows that the following colloquy occurred: " 'Did you see what happened,' and I said, 'I didn't see nothing.' He said, 'You seen I had the gates down, didn't you'?

I said, 'No, I didn't see nothing.' He said, 'You know that means my job, don't you' "?

For the defendant, Brandimore testified that he put the gates down and saw the decedents drive through them. The engineer and Mrs. Reynolds testified that the gates were down on the south side of the crossing, and the fireman that they were down on the north side. Considering the testimony in the light most favorable to the plaintiff, as we are required to do, we think the testimony of Ausberger, in connection with other facts and circumstances, was sufficient to present a jury question. His testimony in this respect is in a different category from that given concerning the bell and whistle. Here he was driving a car directly toward the crossing. We think it must be assumed that he was looking in that direction and when he states that he saw no gates down, that is evidence the weight of which was for the jury. Especially is this true in view of the fact that he continued driving toward and across the tracks before he stopped.

Defendant places great stress upon a circumstance which it is claimed is conclusive proof with reference to the position of the gates at the time of the collision. Decedent's car had a metal V8 emblem set at a twenty-five degree angle on its radiator. The portion of the gate pertinent in this case was in evidence and bears an impression of this emblem imprinted in the wood, which, it is claimed, was made when the car collided with the gate. A considerable portion of the trial was devoted to consideration of how and when this imprint was made. A number of witnesses who examined the gate shortly after the collision discovered the imprint and so testified, while numerous other witnesses who likewise examined the gate, discovered no imprint, and some stated positively that no imprint appeared. To discuss the various theories advanced in this respect would unduly prolong our opinion and, perhaps serve no useful purpose.

This is especially true in view of the conclusion we have reached regarding Subsection J. wherein defendant is charged with a failure to provide and maintain sufficient signs and other devices to give warning at that crossing. It is undisputed that to the north of the crossing there was no warning sign of any kind. Decedent was traveling at night over a strange highway and there was nothing to indicate that he was approaching a crossing. Numerous photographs of the crossing and adjacent surroundings were introduced in evidence, and so far as we are able to ascertain from these pictures, as well as from the testimony, there was no warning light at the crossing until the gates were lowered. The trial court, on motion for a new trial, stated: "I think the circumstances surrounding that decedent at and immediately prior to the time of his death were such that he was on that railroad track before he knew it. That street, the photographs show, looked like a tunnel. You cannot see that there is a grade crossing there. I think he was on that railroad track before he knew it, though he was proceeding with care."

While we cannot say, from viewing the photographs, that the street "looked like a tunnel," we think they disclose a situation inconsistent with defendant's theory that the decedent had warning that he was approaching a crossing. Without minimizing what often has been said regarding the duty of a person approaching a railroad crossing, to employ all of his senses for the purpose of ascertaining whether or not it is safe to cross, we do not believe such duty exists until he has knowledge, or by the exercise of reasonable care, should have had knowledge that there is, in fact, a crossing. Otherwise, a person traveling upon a highway would be under a continuous duty to look and listen for a train regardless of where he was with reference to a railroad crossing.

We do not think the question as to whether the gates were down and as to whether the decedent ran through them, and in doing so left an imprint thereon, is the controlling one. Assuming they were down, the more important question is,—when were they lowered? Obviously, if they were not lowered in time to warn the decedent so that he might stop, they served no useful purpose—in fact, might reasonably have produced a situation responsible for the collision. It is not reasonable to believe that decedent would have driven through a red light directly in front of him, and of which he had appropriate warning, and, we think, under the circumstances, that the jury might well have believed either that the gates were not down, or if they were down, they were lowered too late.

We have carefully examined the record with a view of ascertaining just when it is

claimed the gates were lowered. There seems to be no testimony on that point except that of Brandimore who had charge of the gates. According to his testimony, he had knowledge of the approach of the train when it was two and one-half miles out in the country. When the train was a block and one-half from the crossing, so he says, "I started putting the gates down." At the same time the crossing bells were turned on. The record does not disclose what this distance would be in feet, but assuming a block and a half to be of ordinary length, and the train to be traveling 25 miles per hour, he probably "started putting the gates down" about 25 seconds before the train reached the crossing. How many seconds were required to perform the operation of lowering the gates is also not disclosed. Whether all four gates were all lowered simultaneously, is not shown. All we find with reference to this point is that the gates were lowered by a hand mechanism. At any rate, according to the gateman's own version, it well may be doubted if the gates were lowered in time to serve as a warning to decedent.

Defendant, in connection with its argument that the decedent had appropriate warning that he was approaching a railroad crossing, states: "So-called approach signs are not maintained in the downtown section of a city the size of Battle Creek, for the obvious reason that they are unnecessary to motorists using any care in driving. * * *"

The soundness of that statement is dependent upon the question as to whether the decedent was warned in some other manner. That it is the duty of a railroad to give appropriate warning of a crossing, there can be no doubt. The manner in which that duty shall be discharged varies according to the circumstances and surroundings, and ordinarily is a question for the jury. Grand Trunk Railway Co. of Canada v. Ives, 144 U.S. 408, 420, 12 S.Ct. 679, 36 L.Ed. 485. In the instant case, it can not be held as a matter of law that the defendant was free from negligence in this respect, and the question properly was submitted to the jury.

In view of what we have said, we do not think that the negligence charged in Subsection K.—that is, that the defendant negligently drove and managed its engines and cars,—should have been sub-

mitted to the jury. On the other hand, Subsection L. which alleged the defendant negligently maintained and operated its said railroad crossing, was properly submitted.

Defendant earnestly insists that the decedent was guilty of contributory negligence so as to preclude a recovery. Here again we conclude that the question was one for the jury. Defendant's argument in this respect is predicated largely upon its theory that the decedent drove through the gates and collided with the train, and that this indicates the automobile was being driven at a high rate of speed and not with reasonable care. What we have said heretofore concerning the gates largely disposes of this contention. The fact that the automobile collided with the train does not, in itself, necessarily indicate the car's high rate of speed. Other than this, there is not a scintilla of evidence but that the decedent was driving with due care for his own safety. We agree with what the court said in Fairchild v. Detroit, G. H. & M. R. Co., 1930, 250 Mich. 252, at page 257, 230 N.W. 167, 169: "* * * The presumption which prevails in the absence of testimony to the contrary that one accidentally killed was not guilty of contributory negligence is based on the common knowledge of mankind that one will ordinarily exercise such care as is requisite for his own safety. No witness in this case was able to give any testimony which tended to sustain a contrary conclusion as to plaintiff's decedent. The law presumes that he exercised reasonable care. Gillett v. Traction Co., 205 Mich. 410, 171 N.W. 536. * * *"

It is true, as pointed out by the defendant, that the court in that case was considering a minor decedent who was not the driver of the car. We do not think, however, that the principle can be thus distinguished. In either event, a person is charged with the duty of exercising ordinary care for his own safety. No doubt, what constitutes such care in the two situations is different, but the presumption that the requisite care was exercised is sound in either instance.

Defendant also argues that after decedent was within the crossing gates, he yet, by the exercise of ordinary care, could have avoided the collision. This is, in the main, a matter of conjecture. It is not a question as to what the decedent

might have done but what a reasonable person would have done under circumstances then presented. The team track was first and on this, to decedent's right, were some box cars which perhaps obstructed his view of the approaching train. Thirteen feet farther was the west bound main track. It would seem certain, by that time, that he must have known of the approaching train. Whether he realized on which of the main tracks the train was approaching, no one now can say, but whether he did or not, another thirteen feet took him into the path of the train. We do not think a court can say, as a matter of law, that the conduct of a man, at such a critical time, confronted with that situation, no doubt confused, if not bewildered, was such as to justify a holding that his death and that of his son was occasioned by his neglect. Again, it was a question for the jury.

 Defendant also contends that the court committed error with reference to certain instructions. The chief complaint has reference to what is designated as Instruction No. 1, wherein the jury was told in substance that every person is bound to know that a railroad crossing is a dangerous place and that a person is guilty of negligence unless he approaches it as if it were dangerous. To this statement, admittedly correct in general, the court added: "of which he had knowledge or in the exercise of ordinary care should have had knowledge." It is this limitation of the general rule of which defendant complains. We conclude that the criticism is not justified under the circumstances of the instant case. It clearly appears to us that before the general rule can be given application, the person must be aware that he is approaching a crossing and a place of danger. To conclude otherwise is to hold that the law imposes upon one using a highway, not only the knowledge that a railroad crossing is a dangerous place, but also knowledge as to its location. Such an imposition is neither reasonable nor logical. It is the duty of the railroad, in such manner as the circumstances may require, to give to one using the highway, appropriate warning that the railroad intersects such highway. If the railroad has failed in its duty in this respect, and a person traveling on the highway by the exercise of reasonable care has not acquired such knowledge, it is our view that the law imposes no duty upon him different from that required at any other point on the highway. Defendant's contention would require a person using the highway to take precautions against a danger of which he was ignorant. Other questions concerning the instructions do not require discussion.

 Defendant also argues that the court erred in permitting the introduction of so-called expert testimony on the question of whether the imprint on the gate was or could have been made by the V8 emblem on the radiator of decedent's car. From what we have said heretofore, it appears to us that the importance of the question as to whether or not the imprint was made upon the gate as claimed by the defendant has been greatly exaggerated by both sides. The existence of the imprint, under defendant's theory, no doubt, would indicate that the car collided with the gate, but as pointed out heretofore, that may be true and yet defendant could be guilty of negligence in not lowering the gates in apt time. Thus, the expert testimony did not concern an ultimate fact which the jury was called upon to determine. The question as to whether or not this testimony was properly admitted, we regard as a close one, but not necessary for decision. We have read it and conclude that in any event, it does not constitute reversible error.

Defendant's argument that reversible error exists by reason of the alleged prejudicial conduct of plaintiff's counsel also is without merit.

The judgments are affirmed.