## METROPOLITAN LIFE INS. CO. v. HAACK et al.

### Civil Action No. 642.

District Court, W. D. Louisiana, Shreveport Division.

May 7, 1943.

Jackson & Mayer, of Shreveport, La.,
for plaintiff (interpleader).

Cook, Lee, Clark & Egan, of Shreveport, La., for Mrs. Vonnie B. Haack, defendant.

Eugene J. Coen, of Shreveport, La., for Mrs. Clara C. Haack, defendant.

PORTERIE, District Judge.

Arthur H. Haack married Clara Renaud at St. Louis on September 12, 1912. On January 2, 1913, while a resident of the state of Missouri, he secured an ordinary policy on his life from the Metropolitan Life Insurance Company in the sum of $2,000. The application contained the following questions and answers with reference to the beneficiary:

"Q. 22—Whom do you designate to receive the proceeds of the policy applied for in case of your death? A. Wife, Clara C. Haack. Age—22. Occupation—Housewife. Post Office address—2129.

"Q. 23—Do you reserve the right to change the beneficiary at any time without the consent of beneficiary herein designated? A. Yes."

The two lived together until June 29, 1923, when they began to reside apart, both remaining in the city of St. Louis. And such was their status until the month of April in the year 1931, when Mr. Haack moved to Shreveport, Louisiana.

On December 7, 1926 (during the period when they were in St. Louis, living apart), Clara approached her mother, Mrs. Mary Renaud, upon the suggestion of, and, to judge from the circumstances, under the influence of, her husband, and induced her mother to find money for Mr. Haack—who, during the period of thirty years covered by the evidence of this case, seemed always to be in need of money in varying sums. The mother gave Clara First National Bank Participation bonds in the principal sum of $2,000, and Clara and Arthur went together to the First National Bank of St. Louis, Missouri, and made an initial loan of several hundred dollars with the collateral, but which loan it was understood would be raised from time to time to reach the full extent of the amount that the First National Bank of St. Louis would lend on the security. The money was handed to Arthur at the bank window.

The policy of insurance, when first delivered, had been immediately given by Mr. Haack to his wife Clara, and though she had already possession of the policy at the time of the loan, it was at that time again stated by Mr. Haack that she would retain the policy, that she was the named beneficiary therein, and there was particular reference made to the clause in the policy contract referring to change of beneficiary, to-wit: "Change of Beneficiary.—When the right of revocation has been reserved, the Insured, if there be no existing assignment of the Policy, made as herein provided, may, while the Policy is in force, designate a new beneficiary with or without reserving right of revocation by filing written notice thereof at the Home Office of the Company, *accompanied by the Policy for suitable endorsement thereon. Such change shall take effect upon the endorsement of the same on the Policy by the Company. * * *"* (Italics supplied.)

Was there a clear and definite meeting of the minds such as to support an enforceable contract, between Clara, the wife, and Arthur, the husband, at the time of the advance of this money? The mother of Clara, in answer to Interrogatory No. 13, says: "I gave these bonds to my daughter, Mrs. Clara Haack, in December, 1926, for the purpose of borrowing money from the First National Bank. She wanted to make a loan at that time so as to get money with which to pay off a lot of Arthur Haack's debts. *She hoped thereby to become reconciled*, and I didn't want to put anything in her way, and therefore gave her these bonds." (Italics supplied) Also, in answer to Interrogatory No. 6, the mother said: "After their separation, they never went back together again, but both lived here in St. Louis. *My daughter always thought that she and Arthur Haack might some day become reconciled, but they never did.*" (Italics supplied)

There was no promissory note made either to Clara or to her mother, no paper of any kind passed between the parties. This doubt as to whether or not there was any thought or expectation of any repayment makes this case difficult of decision. After reconciliation proved impossible, Clara pressed the divorce, and then active thought of repayment entered her mind.

It is a fact in this record that Clara paid the annual premiums of $30.38 on this Metropolitan policy, beginning in January, 1925, and continuously thereafter until July, 1934; for a like period of time she also paid the premiums on another $2,000 policy that Mr. Haack had with the Balti-

more & Ohio Railroad Relief Association, the annual premium on this latter policy being $24; and she also paid the annual premium for a life and accident policy for the same period of time with the Monarch Life Insurance Company, the annual premium of the latter being $12. Clara at the trial of the instant case states that she paid these premiums because she had originally promised to pay them at the time that the other money loans, finally reaching the aggregate of $2,000, had been made by her with the help of her mother to her husband Arthur. The record discloses from the bank books the eventual payment by Clara of the $2,000 loan at the bank.

During this period of years, 1925 to 1934, Clara also borrowed from two personal friends the sums of $200 and $100, which also were used to pay debts or premiums for Haack.

It was not long after Arthur had moved to Shreveport in April, 1931, before Clara, who had remained at St. Louis, instituted divorce proceedings which finally culminated in a full and final decree, in October of the year 1932. On March 23, 1933, Arthur was married, in Shreveport, to Vonnie B. Matthews—whom we shall call Vonnie, for the sake of brevity.

There are several letters exchanged at about this time which, because of their necessary effect in this case, we have to quote in full. The first one in point of time is dated February 26, 1932, at Shreveport, Louisiana, and is from Arthur to Clara, as follows: "Clara: Your letter received. Of course I want you to get the money, only sorry I can't let you have it in cash, but things are in an awful mess, its Hell—I want you to get the insurance if I die but if you should die before I do I would want the policy back so I could pay it for, maybe my Mother or the Kids —See, I don't want it to go to some one else if you die first and under the agreement the Insurance Company wants me to sign it would belong to you and your heirs. Do you understand, Clara I'm not trying to be mean, and I know you understand don't you Clara. Well may you be happier than I am. From Arthur"

The next letter, also from Arthur to Clara, dated April 23, 1933, showing that it was written in the worst of a judicially-recognized depression, would indicate that Clara, now without employment, having already exhausted her mother's available funds and her own separate funds earned through her own labor, had become greatly in need of money, so she had made Arthur agree to make a loan on the Metropolitan policy, the proceeds of the loan to go to her: "Clara: Your special dely recd and check for loan on my policy 891394 for $120.28 how much is outstanding against the policy now. Was the old loan paid if not what is the total amount due would like to get it all straight some day soon the more thats paid the more the policy will be worth I just borrowed $2.00 last night till pay day & owe $15.00 of my salary already & just about am getting by sure is hell trying to make both ends meet if only things begin to pick up. Clara I'm sending you a cashiers check for $110.00 I have taken $10.28 & Ill send that to you right after the first of the month, I know the bank note is due in May and surely I can use $10.00 till the first hope you dont think Im mean about this but I do need a few dollars so so bad & Im sure if you get the $110 now it will help you wonderfully. So sorry I must have a small amount now Wish I could send the whole check to you. Just had a judgment against me of $65.00 in the St. Louis courts & must pay that some how. It was the loan shark that the Better Business Bureau was handling. When I left they fell down on the job & I have to pay Lord only knows how it is to be done, Im frantic, maybe you saw the judgment in the papers they garnisheed my salary for 6 months so you see Im up against it bad Oh well we can only hope for better days Just live in hope I guess. I know you dont mind the deduction when Im going to send it to you, Gee I could use that check but I know you need it worse than I do Glad to hear my mother has her teeth & do hope they fit. Your mother I hope is well tell her & Larry Hello also tell Alma & Russell Hello. Why dont Russell write just a word to me I think of him a lot. Well be brave & hope for the best & maybe someday the brightest sun will shine for us both for you especially is my earnest wish. Arthur."

A letter dated January 15, 1934, by Clara to the Metropolitan Life Insurance Company, shows her fear of Arthur doing something which would rob her of security through her possession of the policy, and also that she had come to know of his second marriage and realized that any collection on the debt was improbable, since he had never paid anything but the

small sum of $110 and that had been by using the policy itself as security for the loan. She proposes in this letter what appears to us to be in the nature of a compromise:

"Gentlemen: In reference to Policy #891394 A Arthur H. Haack. We separated June 29—1923 but I did not get my divorce till Oct. 13—1932. All these years I was compelled to work and paid his insurance premiums from Jan. 1924 to Jan. 1933 inclusive at Tower Grove District. Being unemployed for over a year it was impossible to pay the premium due Jan. 1934 so I mailed Mr. Haack the bill. I am still holding the Original policy #891394 A in my possession. Thought he may write in for a *new policy* saying old one was lost as I heard he has recently remarried I am writing direct to New York as Mr. Haack may take this matter up with your Shreveport, La., office as he is now located there. If he writes in for policy I am willing to turn over same provided he *pays* me the 10 back premiums I have had to pay to keep same in benefit. Any information or advice will be greatly appreciated. Respectfully, Mrs. Clara Haack."

From the marriage of Mr. Arthur Haack to Vonnie Matthews there was born a son who now is a minor, with Mrs. Vonnie Haack as his natural tutrix by appointment of the court.

The following excerpt from the evidence of Clara is illuminating on the character of Arthur:

"A. When he came to me in 1926 and talked to me about getting additional money, I told him I didn't have any money, and didn't know where I could get any, and he said, 'Your mother has those bonds; won't she put them up for collateral for me?'

"Q. What bonds? A. The $2,000 bonds for the First National Company. They were First National Company participation bonds. My answer to that was that was that I had given him everything that I had, and now he wanted my mother's money, and what security would I have? I had no security. He said, 'You have got hold of all three of my insurance policies', and he said, 'You hold them —'." (Transcript, p. 23)

Further in the lady's testimony the following answer is interesting. "He came to the house and got me and my mother— got my mother to give me the key to the Safety Deposit Box, and he went with me and got the bonds. We went up to the vault of the bank and got the bonds, and then went upstairs to the bank, the First National Bank, and we asked if we could make a loan on the bonds and the bank let us have the money, and he took the money there direct from the teller." (Transcript, p. 25)

The Metropolitan Life Insurance Company knew of the claim of the first wife under the policy because Arthur, during his life, had written to the company for a change of beneficiary from Clara to Vonnie, on September 1, 1934, September 24, 1934, and on January 30, 1936. Only one reply was made by the company to these letters, dated September 12, 1934, part of which is quoted: "We are very sorry but we find no record of this policy being presented to us for this change, and we would appreciate you advising us if you gave this policy to one of our representatives, or if you mailed it direct to our New York Office. We will appreciate you letting us hear from you, as we wish to assist you in locating your policy, then making whatever change you wish made."

Arthur H. Haack died at his home in the city of Shreveport on December 26, 1941. Clara surrendered to the Metropolitan Company the original policy in her possession since 1913, along with proof of death, and demanded payment as the designated beneficiary. Concurrently, Vonnie, the second wife, collected $2,000 from the Baltimore & Ohio Relief Association policy; and, acting individually and as the natural tutrix of her minor son, she instituted suit No. 84526, entitled Mrs. Vonnie B. Haack et al. v. Metropolitan Life Insurance Company, in the first Judicial District Court of Caddo Parish, State of Louisiana, to collect upon the Metropolitan policy.

The Metropolitan Life Insurance Company then filed the present complaint of interpleader, showing that there had been loans in the sum of $533.57 made to the assured, and accordingly depositing with the Registry of Court the balance of $1,-541.08. By mutual agreement the proceedings in the state court have been stayed and the issue has been fully pleaded here and the trial had.

To the present claims of Mrs. Clara Haack, Mrs. Vonnie Haack, for herself individually and as natural tutrix for the

minor child, has filed the plea of prescription of three and of five years; and this is the end of our narrative and findings of fact.

The task of the application of the law in this case is a long and tedious one.

■ Counsel for Mrs. Clara Haack contends that the law of Louisiana should govern the interpretation of the contract, because the interpleader suit has been filed in this Federal court of Louisiana and Mrs. Clara Haack has placed nothing of record to prove what are the laws of Missouri, and therefore this court is without right or power to apply the laws of the state of Missouri since these laws are not made a matter of proof in the record, citing the case of Hanley v. Donoghue, 116 U.S. 1, 6 S.Ct. 242, 29 L.Ed. 535. The case is not in point, because the Supreme Court of the United States was restricted to the record made in the state court and by the state rule on appeal. However, from the same case we take the following (116 U.S. at page 6, 6 S.Ct. at page 245, 29 L.Ed. 535): "When exercising an original jurisdiction under the constitution and laws of the United States, this court, as well as every other court of the national government, doubtless takes notice, without proof, of the laws of each of the United States. * * * In the exercise of its general appellate jurisdiction from a lower court of the United States, this court takes judicial notice of the laws of every state of the union, because those laws are known to the court below as laws alone, needing no averment or proof. Course v. Stead, 4 Dall. 22, 27 note, [1 L. Ed. 724]; Hinde v. Vattier's Lessee, 5 Pet. 398, [8 L.Ed. 168]; Owings v. Hull, 9 Pet. 607, 625, [9 L.Ed. 246]; United States v. Turner, 11 How. 663, 668, [13 L. Ed. 857]; Pennington v. Gibson, 16 How. 65, [14 L.Ed. 847]; Covington Drawbridge Co. v. Shepherd, 20 How. 227, 230, [15 L.Ed. 896]; Cheever v. Wilson, 9 Wall. 108, [19 L.Ed. 604]; Junction R. Co. v. Bank of Ashland, 12 Wall. 226, 230, [20 L.Ed. 385]; Lamar v. Micou, 114 U. S. 218, 5 S.Ct. 857, [29 L.Ed. 94]." See 32 C.J., Verbo "Insurance", under the topic "Conflict of Laws":

■ "Insurance contracts made in foreign jurisdictions are recognized and enforced because of comity; not, however, as a matter of right." (§ 5, p. 976)

■ "The intention of the parties may be express or be implied from the nature and terms of the contract and the general circumstances of the case. The substantive rights of the parties under the proper law of the contract are not affected by the removal of the proceeds of the policy to another state to abide the result of a suit there pending; the removal affects only the parties' remedial rights." (§ 5, p. 977)

■■ "The act of the parties in entering into a contract at a particular place indicates prima facie their intention to contract with reference to the laws of that place; and accordingly, as a rule, an insurance contract is governed as to its nature, validity, and interpretation by the law of the place where it was made, unless the parties clearly appear to have had some other place in view; * * *" (§ 7, p. 977)

Cited among the cases supporting the above text from Corpus Juris are the following decisions from Louisiana: City of Shreveport v. New York Ins. Co., 141 La. 360, 75 So. 80; City of Lake Charles v. Equitable Life Assur. Soc., 114 La. 836, 38 So. 578; Grevenig v. Washington Life Ins. Co., 112 La. 879, 36 So. 790, 104 Am. St.Rep. 474; and the following cases from Missouri: Head v. New York Life Ins. Co., 241 Mo. 403, 147 S.W. 827; Cravens v. New York Life Ins. Co., 148 Mo. 583, 50 S.W. 519, 53 L.R.A. 305, 71 Am.St.Rep. 628; New York Life Ins. Co. v. Craven, 178 U.S. 389, 20 S.Ct. 962, 44 L.Ed. 1116.

■ The following is found in the case of New York Life Ins. Co. v. Chapman, 8 Cir., 132 F.2d 688, 691: "In the federal courts in diversity of citizenship cases the conflict of laws rules of the courts of the state in which the federal court sits control. Griffin v. McCoach, 313 U.S. 498, 503, 61 S.Ct. 1023, 85 L.Ed. 1481, 134 A. L.R. 1462; Order of United Commercial Travelers v. Meinsen, 8 Cir., 131 F.2d 176, 179. The Missouri courts hold, and the parties concede, that a contract of insurance is made in the state where the last act is done which is necessary to complete the contract and bind the insured and the insurer. Yeats v. Dodson, 345 Mo. 196, 127 S.W.2d 652, 656, 138 S.W.2d 1020; Cravens v. New York Life Ins. Co., 148 Mo. 583, 50 S.W. 519, 53 L.R.A. 305, 71 Am. St.Rep. 628; Hamilton v. Darley, 266 Ill. 542, 107 N.E. 798, 799."

The general rule is that the law of the place where a contract is made or entered into governs with respect to its nature, validity, application, and interpretation. See Conflict of Laws, 15 C.J.S., § 11, p. 883. The contract of insurance is completed at the place where the policy is delivered and the first premium collected. See Mutual Life Insurance Co. of N. Y. v. Johnson, 293 U.S. 335, 55 S.Ct. 154, 79 L.Ed. 398.

And, again, in Louisiana, a fire policy issued in Mississippi and covering property in such state was a Mississippi contract. Eicher-Woodland Co., Inc., v. Buffalo Ins. Co. of New York, 198 La. 38, 3 So.2d 268.

But there is no conflict between the Missouri law and the Louisiana law on this particular, anyway. See the Louisiana and Missouri cases cited, supra, and, additionally, these expressions: Coci v. New York Life Ins. Co., 155 La. 1060, 99 So. 871; Horton v. New York Life Ins. Co., 151 Mo. 604, 52 S.W. 356; Summers v. Fidelity M. Aid Ass'n, 84 Mo.App. 605; and Mutual Benefit Health & Accident Ass'n v. Baldridge, 10 Cir., 70 F.2d 236.

Since our findings of fact show that the contract clearly was entered into in Missouri, the husband and wife then being married and residents there, the policy having been delivered in that state, and the first premium there paid, the law to be applied in the interpretation of the contract is the Missouri law.

The next step in the application of the Missouri law is as to change of beneficiary. We have to consider the Missouri Statutes, Section 5850 (1939), Mo.R.S.A. § 5850, which reads as follows: "Any policy of insurance heretofore or hereafter made by any insurance company on the life of any person, expressed to be for the benefit of the wife of the insured, shall inure to her separate benefit, independently of the creditors, executors, and administrators of the husband: Provided, however, that in the event of the death or divorcement of the wife before the decease of the husband, he shall have the right to designate another beneficiary, upon written notice to the company, but such notice shall not be effected, unless indorsed upon the policy by the president or vice-president and secretary of the company issuing the policy."

The above statute is applicable, because Haack sought to change the beneficiary after his first wife had divorced him. In the case of Orthwein v. Germania Life Insurance Co., 261 Mo. 650, 170 S.W. 885, 888, the Missouri Supreme Court, commenting upon this statute, said: "* * *, her rights are either contingent on the absence of her death or divorcement and on his naming a new beneficiary after either event; or, if spoken of as vested, they are subject to be divested on condition subsequent. According to all acceptable doctrine, that statute must be read into the policies and become a speaking and vitally operative part thereof."

The Missouri Court of Appeals said that the right in the husband to the change of beneficiary under this statute existed even though the wife had procured a divorce based on the husband's fault, using the following language, in the case of Haven v. Home Insurance Company, 149 Mo.App. 291, 130 S.W. 73, 75: "If we are to hold that this statute is to be limited to those cases only in which the divorce shall be granted for the fault of the wife, then, after divorce we are attempting to force the husband to continue to provide for his divorced wife even though he be under no legal obligation to support her and in the face of the fact that there would be no moral obligation upon him to support her. * * * Our conclusion is that the purpose underlying this statute is to vouchsafe to the husband, without regard to who was in fault in the divorce proceedings, the same freedom of action in providing for those whom he might be under some moral obligation to provide for after his death that he would have had if the marriage relation had never existed between him and [his ex-wife]."

In Mutual Life Insurance Company v. Tuemler, Mo.App., 251 S.W. 727, 729, Tuemler's wife obtained a divorce from him for his fault; thereafter Tuemler sought to name his sister beneficiary of his policies in lieu of his ex-wife but the company refused to make the change. The policies were in the possession of the ex-wife. The Missouri Court considering the statute, quoted supra, said:

"It is conceded that the written notice required by the statute was given by the deceased to the company. This was all the deceased was required to do to effect a change of beneficiaries. All that remained to be done was the purely formal matter, on the part of the officers of the company, to indorse the change on the policy, without any discretion on their part. * * *

"The requirement of the statute, in regard to the endorsement by the insurance company upon the policy of the change of beneficiary, is for the benefit of the company, and relates to the evidence of the change; the failure to so indorse the policy does not affect the change itself."

■ Therefore, the Missouri law applies; and in view of the liberal interpretation of the statute by the Missouri courts, which would not require in the instant case that the policy should have been delivered to the Metropolitan Life Insurance Company for a change of beneficiary to become effective, we rule that the beneficiary was effectually and legally changed by the letter of September 1, 1934, from Arthur Haack to the Company (and as of that date).

The Louisiana law on the change of beneficiary is in conflict with that of the state of Missouri. See Giuffria v. Metropolitan Life Insurance Co., 188 La. 837, 178 So. 368. This fact is of no influence in the case since we have to apply the laws of Missouri.

■ We must now consider the plea of prescription. We believe the plea of prescription of three years is effective as to the loan, which classifies as an account, made to Arthur by Clara with the help of her mother's securities. Louisiana Civil Code, Art. 3538. Even if the supposed loan had been represented by a promissory note, there having been no payment on the loan from the time it was made in 1926 to the year when the policy was used for a loan from the insurance company in 1933, a period of seven years, the debt is barred by the plea of five years. And, moreover, between the year 1933 and the date of the interpleader suit, April 31, 1942, again the period exceeds five years. Louisiana Civil Code, Art. 3540.

■ Even if we could say that because of the facts supporting the oral loan agreement and the ensuing equities, there had been a lien on the policy in favor of Clara, the prescriptive rules of Louisiana would nevertheless bar her recovery.

We have read and analysed with much interest the case of Succession of Mereno, 161 La. 84, 108 So. 133, in order to determine its applicability here. On the point of the evidence necessary, under Article 2277 of the Civil Code of Louisiana, to prove a contract for the payment of money, not reduced to writing, in excess of $500, we believe there was not in the instant case proof "by at least one credible witness, and corroborative circumstances". 108 So. at 134. In the Mereno case, the corroborative circumstances were that a series of monthly receipts, *signed by the mother,* for a period of nine years, were placed in the record by the daughter-claimant. We have practically a total want of such written acknowledgment here. The Court said (108 So. at 135): "* * * It cannot be said, we think, that the delivery of this money to the mother was a mere contribution by the daughter to the mother with no hope or expectation that the money would be repaid, for, if it were such, the mother hardly would have gone to the trouble of giving her daughter receipts for the amounts received during a period of nearly nine years, and the daughter hardly would have gone to the trouble of receiving and preserving the receipts, or of permitting her mother to go to that trouble. Our conclusion is, as was that of the trial judge, that the loan has been fully established.

So much for this basic factual difference; but what about legal differences? In the Mereno case, the issue at law was whether or not the *estate* of the deceased mother was to be burdened by the claim of the daughter, as a recognized debt under the succession laws of Louisiana; in the instant case, we are concerned by the questions, firstly, as to whether or not there was a loan to be repaid at all, and, secondly, as to whether or not, granting there was a loan, a lien on the policy was established—to the degree of a vested right—such as, under the jurisprudence of the state of Missouri precluded a change of beneficiary, or, if permitting the change, caused the lien to follow the policy and survive in the new beneficiary's hands. Again and additionally, on this point of law, we must hold the Mereno case, supra, inapplicable here.

The next case presented for our study and consideration is the Succession of McCloskey, 144 La. 438, 80 So. 650, 652. Again the questions of law are not similar; exactly the same difference exists as between the instant case and the Mereno case, just considered. So much for this basic legal difference; but what of the factual differences? In this McCloskey case, "during the lifetime of her former husband, and while they were still living together as husband and wife, plaintiff filed

in the mortgage records of Orleans parish an affidavit, as she was permitted to do by law, setting forth the facts to which she now swears concerning her claim. This was at an unsuspicious time. We must assume, since it was a matter of public record, that the deceased knew of it, and he permitted it to remain there during all those years unquestioned. Besides, plaintiff is supported in her statements by the testimony of her mother, who says she gave her daughter the money which the latter claims to have turned over to her husband, out of the proceeds of an insurance policy on the life of plaintiff's father, in accordance with the latter's wish. It is true, Mrs. McDevitt did not see her daughter deliver the money to her husband, nor is she able to swear that it was never repaid. Still, the circumstances are such as to render the testimony of these witnesses plausible, and to carry with it the force of conviction. The district judge, who saw and heard them testify, was so impressed, and we are constrained to agree with him."

There is not the semblance of an approach in the whole record of the instant case to the manifest legal significance of the *recordation* of a *claim sustained* by *affidavit* in the *public mortgage records*. No, in the instant case, there was not a promissory note signed, nor was there an assignment of the policy, etc. So, this second cited case is not applicable.

▆▆▆ There is another aggregate debt in this case, however, of a different nature and character. The amounts of money that Clara paid yearly on the three policies, not only the one at issue here but the other two, beginning in January, 1925, and continuously thereafter until July, 1934, represent amounts paid for another. This type of obligation is not extinguished by the want of payment during only five years. The prescriptive period is ten years. Article 3544 of the Louisiana Civil Code; Reddick v. White, 46 La.Ann. 1198, 15 So. 487; Bryceland Lumber Co. v. Kerlin, 143 La. 242, 78 So. 482; Linton v. Wikoff, 12 La.Ann. 878.

▆▆▆ It is an indisputable fact—proved in the handwriting of Arthur himself—that Arthur made a partial payment to Clara on April 23, 1933, of $110 on account. That payment revived, as of that date, and kept alive the obligation to return the annual premiums paid on the three policies

for Arthur since the year 1925 to that date of part payment. There has not been ten years between this payment of April 23, 1933, and the date of the institution of this interpleader suit, to-wit, April 3, 1942; and thus the payments made for another are due, and still exigible.

We are urged in one of the briefs filed in this case to direct Clara to the estate of Arthur (admittedly with no assets) for the payment of not only the money representing the original loans but even for the money advanced by her in payment of the premiums which kept the policies of insurance alive; and at the same time, of course, to deny her a lien of any character, and any right to look to the proceeds of the life insurance policy for the return of her money. We could not do that except with the prescience of wrongdoing. We do not have to rule in this interpleader suit (and, therefore, do not) as to whether or not the estate of Arthur Haack is liable for the supposed loan from Clara.

We believe an attentive reading of the case of Ives et al. v. Henderson, 169 La. 844, 126 So. 212, will support not only our final ruling in this case, but also the several decisive turns we make in reaching our final view.

▆▆▆ The right of pledge does not exist in this case, because the manual possession of the life insurance policy (the contract between the insurer and the insured) is not the equivalent of the possession of an article like a gold watch or a suitcase, nor is it the same as the holding of a chose in action, the latter being in some cases readily transferable or negotiable, and in other cases, as in the case of a bond and like securities, the physical possessor is the owner and valid transfer can be made by the mere manual delivery. We have said also that at no time did Arthur agree to what is accepted as an assignment of the life insurance policy; the fact is, in the letter dated February 26, 1932, he specifically refuses to make an assignment. Upon the request by the court for a second briefing of this case, the form for the assignment which he had received from Clara at the time that he did not sign is filed and placed of record.

In the Ives case, supra, the organ of the court, after making a study of some of the jurisprudence of Louisiana as to whether or not prescription existed in the various cases where there was the question of the

existence or not of a pledge or pawn, finally passes upon one of the issues which we think makes the case quite pertinent here. We shall quote a paragraph from the case: "Defendant has not shown that any repairs to the plaintiffs' dwelling house or cabins were made during the 10 years immediately preceding the filing of this suit. It is shown that defendant paid all taxes against the property for the 14 years preceding the filing of the suit. The prescriptive period, for recovery of such payments by the tax subrogee, is 10 years. Defendant is therefore entitled to judgment on his reconventional demand for the taxes paid by him during that period of time, * * *." 126 So. at 214.

■■■ We believe that by the same reasoning whereby the one who paid taxes on property for another, thus saving the property for the other, was directed to the proceeds of the sale of the property for his reimbursement, though he had filed in the mortgage records no subrogation for the taxes, it should be held here that the money advanced by Clara for the payment of the premiums on the life insurance policy at issue in this interpleader suit, which really saved the policy for Arthur, is to be repaid, with interest, from the date of respective payments of each premium out of the proceeds of the insurance contract.

We are cited three Missouri cases to sustain the point that limitation cannot begin to run in this case until the policy matured—the condition precedent to its maturity being the death of Haack. The cases are: Bush v. Kansas City Life Insurance Company, Mo.Sup., 214 S.W. 175; First National Bank v. Security M. L. Insurance Company, 283 Mo. 336, 222 S. W. 832; Bush v. Block, 193 Mo.App. 704, 187 S.W. 153. There was in each of these cases the most formal type of written assignment—not so in the instant case. We find the three cases to be inapplicable.

■■■ The Louisiana law as to prescription should apply because prescription (limitation of actions at common law) is a remedy. 15 C.J.S., Conflict of Laws, p. 948, § 22(a); idem, at page 953, § 22(e); Tinsley v. Mills, D.C., 36 F.Supp. 621 (and cases cited therein).

The language in a relatively recent utterance by the Supreme Court of the United States gives *additional* and renewed approbation to the long-standing rule just stated. We quote from the case of Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, decided June 2, 1941 (October term, 1940), where it is said: "We are of opinion that the prohibition declared in Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, against such independent determinations by the federal courts extends to the field of conflict of laws. The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts. Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side. See Erie Railroad v. Tompkins, supra, 304 U.S. at 74–77, 58 S.Ct. at 820–822, 82 L.Ed. 1188, 114 A.L.R. 1487. Any other ruling would do violence to the principle of uniformity within a state upon which the Tompkins decision is based. Whatever lack of uniformity this may produce between federal courts in different states is attributable to our federal system, which leaves to a state, within the limits permitted by the Constitution, the right to pursue local policies diverging from those of its neighbors. It is not for the federal courts to thwart such local policies by enforcing an independent 'general law' of conflict of laws. Subject only to review by this Court on any federal question that may arise, Delaware is free to determine whether a given matter is to be governed by the law of the forum or some other law. Cf. Milwaukee County v. M. E. White Co., 296 U.S. 268, 272, 56 S.Ct. 229, 231, 80 L.Ed. 220. This Court's views are not the decisive factor in determining the applicable conflicts rule. Cf. Funkhouser v. J. B. Preston Co., 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243. And the proper function of the Delaware federal court is to ascertain what the state law is, not what it ought to be." 313 U.S. at 61 S.Ct. at 1021, 85 L.Ed. 1477.

We consider the Klaxon case, involving "interest" on the debt, to be directly applicable here, though in this suit "limitation of actions" is involved.

What is the Louisiana rule of conflicts when limitation of actions be concerned? The Louisiana Code of Practice, Article 13 (the law since the Code of 1825), says: "The forms, the effects, and the prescription of actions, are governed by the law of the place where they are brought; but

contracts are governed by the law of the place where they were entered into." The jurisprudence under the Article has undeviatingly followed the Article. See Union Cotton Manufactory v. Lobdell, 7 Mart.,N.S., 108; Erwin v. Lowry, 2 La. Ann. 314, 46 Am.Dec. 545; Newman v. Goza, 2 La.Ann. 642; Lacoste v. Benton, 3 La.Ann. 220; Brown v. Stone, 4 La. Ann. 235; Bacon v. Dahlgreen, 7 La.Ann. 599; Succession of Lucas, 11 La.Ann. 296; Tate v. Garland, 12 La.Ann. 525; Walworth v. Routh, 14 La.Ann. 205; Newman v. Eldridge, 107 La. 315, 31 So. 688; White v. Davis, 174 La. 390, 141 So. 6.

But counsel for Mrs. Vonnie Haack urges the case of Armour Fertilizer Works v. Sanders, 5 Cir., 63 F.2d 902, affirmed by the Supreme Court of the United States, Sanders v. Armour Fertilizer Works, April, 1934, 292 U.S. 190, 54 S.Ct. 677, 78 L.Ed. 1206, 91 A.L.R. 950. The following forceful, but misleading, language, found at 63 F.2d 906, and quoted approvingly by the Supreme Court, is urgently advanced to induce the application of the Missouri rule as to the limitation of actions: "We do not think the filing of the federal interpleader and the payment thereunder of the money into the District Court in Texas operated to bring it under the dominion of Texas law. The applicant for interpleader often has a choice of forum, and he cannot at his will subject the rights of the contesting claimants to one set of laws rather than another. The purpose of the interpleader statute was to give the stakeholder protection, but in nowise to change the rights of the claimants by its operation. The interpleader is a suit in equity, and equitable principles and procedure are the same throughout the federal jurisdiction. The court is to weigh the right or title of each claimant under the law of the state in which it arose, and determine which according to equity is the better. The decision should be the same whether the interpleader is filed in Illinois or in Texas. No one's rights are intended to be altered by paying the fund into the court, which as an impartial neutral is to determine them."

The whole paragraph speaks of that which is substantive in character, and does not include that which is procedural. The question that follows then is whether or not laws of limitation have been classified and are still classified as procedural. All compendiums of law show limitation of ac-

tions as essentially procedural, as "remedies". We must realize that the content of these digests is composed, sentence by sentence, from the cases; so, the unanimity found signifies unanimity of jurisprudence.

A close reading of the two cases, the one in the Circuit Court and the other in the Supreme Court of the United States, will disclose that the affirmance in the Supreme Court is predicated upon the general proposition that a judgment of the courts of the state of Illinois must be given full faith and credit in the other states of the Union: "To hold that the District Court in Texas could enjoin the Fertilizer Works from proceeding further and then declare that because the last step in the Illinois suit had not been taken Sanders, in some way, became entitled to priority, plainly would be inequitable. Moreover, *it would deny to the garnishment proceedings the credit and effect accorded them in the State where taken.*" (Italics supplied) 292 U.S. at 204, 54 S. Ct. at 682, 78 L.Ed. 1206, 91 A.L.R. 950. The written dissent in the Supreme Court of the United States is by four, and is predicated upon the point that the ex parte judgment of the Fertilizer Works against the nonresident, brought into court by substituted service, coupled with writ of attachment and garnishment, under the laws of the State of Illinois, had not reached such a completeness as would warrant its recognition under the full faith and credit clause.

Moreover, the Klaxon case, 1941, supra, is subsequent in point of time to the Fertilizer Works case, 1934; since an examination of the Klaxon case fails to show any reference whatsoever to the Fertilizer Works case—obviously, as the Klaxon case is predicated upon the Erie R. Co. v. Tompkins, 1938 doctrine, which had not been announced at the time of the decision in the Fertilizer Works case—we are correct in our inference above that the Sanders case has no significance whatsoever insofar as limitation of actions be concerned; and that is true, even when the interpleader act be involved.

Our decision therefore is that there should be judgment in the ten identical sums of $30.38, with the first $30.38 bearing 5% interest from January 1, 1925, until date of deposit of money in court; and each succeeding like sum to have interest begin, each one year after the other, that

is, from January 1, 1926, 1927, etc., respectively; and that there should be a further judgment in the ten identical sums of $24 with the first $24 bearing 5% interest from January 1, 1925, until date of deposit of money in court, and each succeeding like sum to have interest begin, each one year after the other, that is, from January 1, 1926, 1927, etc., respectively; and that there should be a further judgment in the ten identical sums of $12, with the first $12 bearing 5% interest from January 1, 1925, until date of deposit of money in court, and each succeeding like sum to have interest begin, each one year after the other, that is, from January 1, 1926, 1927, etc., respectively; the computation to recognize and allow the credit of $110 as of April 23, 1933.

There will also be judgment in compliance with the Interpleader Act fixing and granting the fees of the attorneys for the Insurance Company.

Judgment in conformity with this opinion will be signed upon presentation.