## GRIFFIN, ADMINISTRATOR, v. McCOACH, TRUSTEE.

No. 755. Argued May 2, 1941.—Decided June 2, 1941.

*Mr. Charles J. Shaeffer,* with whom *Mr. Jos. W. Bailey, Jr.* was on the brief, for petitioner.

*Mr. Carl B. Callaway* for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

This is an action, begun in the United States District Court for the Northern District of Texas, by the personal representatives substituted for the heirs at law of Colonel Robert D. Gordon, who died a citizen and resident of Texas, against the Prudential Insurance Company of America to collect an insurance policy on the life of the decedent. The Company filed a bill of interpleader (49 Stat. 1096; 28 U. S. C. § 41 (26)) making the respondent John D. McCoach, Trustee, and other alleged claimants parties, and tendering the net amount due under the policy. The interpleader was allowed, the Company discharged from the litigation, and the interests of all parties to the suit, other than petitioner and respondent, disposed of by the decree in a manner to which no one objects here. The controversy still to be decided is as to whether the estate

or the Trustee is entitled to certain portions of the insurance.   The circumstances giving rise to the issue follow.

Colonel Gordon, the insured, interested seven persons in Texas oil developments, including McCoach, the Trustee, in his individual capacity.   They operated as a New York common law association called the Middleton Tex Oil Syndicate.   The record here shows that "Prior to the issuing of the policy and thereafter, the members advanced considerable money to Gordon, and the premiums on the policy were paid by the members of the syndicate at Gordon's request, upon his agreement to repay the syndicate. Premiums were paid on the policy by the syndicate, in accordance with this agreement and were never repaid by Gordon."   A term insurance policy was taken out by Gordon with the Syndicate named as beneficiary.   When the policy was issued, and at all times subsequent until his death, Gordon was a citizen of Texas.   The Syndicate originally had physical possession of the policy.   Two years after its issuance the Syndicate ceased operations. In 1924, due to financial reverses, it ceased to do business and the members formed a new association called the Protection Syndicate.   McCoach became and continues as Trustee of the Syndicate.   It was organized "for the sole purpose" of paying the premiums on the policy and receiving and distributing the proceeds among the members.   This it did until the insured's death.   The beneficiary in the policy was changed to make the members of the Protection Syndicate the beneficiaries.   By arrangement between the decedent and the members of the Protection Syndicate in 1934 a further change of beneficaries was made by which, in consideration of the insured's release of the right to change beneficiaries on presentation of the policy for endorsement, hitherto retained, one-eighth of the disability proceeds of the policy were to be paid the insured, and one-eighth of the death proceeds to his wife, and the remaining seven-eighths to the Trustee for the members of the Protection Syndicate.

"The application for the policy was signed by Gordon in the State of New York, and forwarded to the home office of the Prudential Insurance Company in the State of New Jersey, and there acted upon, and the policy was delivered in the State of New York." The later arrangement, by which Gordon and his wife became beneficiaries of one-eighth of the proceeds, was consummated by certain forms furnished by the Prudential and "transmitted . . . from Middletown, N. Y., to Tyler, Texas, for Colonel Gordon's signature. They were there executed by Colonel Gordon before a notary public in Tyler, Texas, and returned to Middletown, N. Y., where they were executed by the parties residing there, from whence they were sent by Schweiger [an agent of the Prudential and a member of the Syndicate], with the policy, to the home office at Newark, N. J., and subsequently the forms were indorsed on the policy and it was returned directly from New Jersey to the beneficiaries in New York."

Thereafter, three of the members of the Protection Syndicate separately assigned their interests in the policy to three individuals not previously interested in the transaction. These assignees paid their proportion of the premiums after the respective assignments.

The District Court decreed that Mrs. Gordon should receive her one-eighth and that the balance of the proceeds should be paid the Trustee for the benefit of the cross-defendants, members of the Protection Syndicate. The decree was based on a finding that the policy was a New York contract and that the subsequent changes were made in New Jersey and delivered in New York. Further, the District Court concluded that the relation of debtor and creditor existed between the members of the Syndicate and their assignees upon the one hand and the insured upon the other, and that therefore all the *cestuis que trustent* had an insurable interest in Colonel Gordon's life.

An appeal limited to the "correctness of the judgment of the trial court concerning the persons entitled to receive the assigned interests" was prosecuted on an agreed statement of the record under Rule 76 of the Rules of Civil Procedure. In the statement, petitioner sets out two points now relied upon for reversal. First: That the assignment and change of beneficiary was governed by the law of Texas; that the Trustee claimed only under the assignment; that beneficiaries must have an insurable interest under Texas law and that the assignees had none. Hence, the personal representative was entitled to recover their portions of the policy for the estate. *Wilke* v. *Finn,* 39 S. W. 2d 836. Second: That if the whole transaction was governed by the law of another state than Texas, in which other state an insurable interest was not required, the United States District Court sitting in Texas was bound by the public policy of Texas which forbids persons without an insurable interest to collect in Texas, as beneficiaries, the proceeds of insurance policies.

. The Circuit Court of Appeals affirmed. 116 F. 2d 261. It held too that the policy was a New York policy, governed by the law of that state, and that, as the subsequent changes were made pursuant to agreements contained in the original policy, they did not amount to new contracts or change the governing law. Cf. *Aetna Life Insurance Co.* v. *Dunken,* 266 U. S. 389. The Court said:

"Under the terms of the policy, a New York contract, no restrictions were placed upon assignments relating to insurable interest. None was created by the laws of New York. Each of the assignments was executed and delivered in New York by residents of that state to other residents. They were New York contracts and valid under its laws. To apply the laws of Texas to the New York contracts would constitute an unwarranted extra-territorial control of contracts and regulation of business out-

side of Texas in disregard of the laws of New York; this is not changed by the trial of the suit in a court sitting in Texas."

As to the violation of the claimed public policy of Texas against beneficiaries with non-insurable interests, the Court of Appeals decided that the rule could not be applied where, as here, a "fair and proper insurable interest" existed when the policy was issued. 116 F. 2d 261, 264. Certiorari was sought and allowed, 312 U. S. 676, on the ground, among others, of a conflict between the instant case and *Sampson* v. *Channell*, 110 F. 2d 754, 759–62, where the First Circuit held that a United States court must apply the conflict of laws rules of the state where it sits.

For the reasons given in *Klaxon Company* v. *Stentor Electric Manufacturing Co., ante,* p. 487, we are of the view that the federal courts in diversity of citizenship cases are governed by the conflict of laws rules of the courts of the states in which they sit. In deciding that the changes made in the insurance contract left its governing law unaffected [1] and that the laws of Texas could not be applied to a foreign contract in Texas courts,[2] the federal courts were applying rules of law in a way which may or may not have been consistent with Texas decisions. Likewise it is for Texas to say whether its public policy permits a beneficiary of an insurance policy on the life of a Texas citizen to recover where no insurable interest in the decedent exists in the beneficiary. The opinion does not rest its conclusions upon its appraisal of Texas law or Texas decisions, but upon decisions of this Court inapplicable to this situation in the light of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, and *Ruhlin* v. *New York Life Insurance Co.*, 304 U. S. 202, 205.[3] The statement in the opinion "that it is im-

---

[1] Cf. *Miller* v. *Campbell*, 140 N. Y. 457; 35 N. E. 651.

[2] Cf. *Union Trust Co.* v. *Grosman*, 245 U. S. 412.

[3] Compare *Grigsby* v. *Russell*, 222 U. S. 149; *Connecticut Mutual Life Ins. Co.* v. *Schaefer*, 94 U. S. 457, relied upon below.

material, in so far as the decision of this case is concerned, whether the law of Texas or the law of New York be applied," we understand, from a reading of the whole opinion, to mean that, while an insurable interest is required in Texas and not in New York, the lack of insurable interest is immaterial in this case even in Texas because "the insurer acknowledged liability and paid the money into court. This being so, not only does the objection of wagers disappear, but also the claimed principle of public policy." But this is something to be decided according to Texas decisions, to none of which the opinion refers. Cf. *Wilke* v. *Finn*, 39 S. W. 2d 836; *Cheeves* v. *Anders*, 87 Texas 287; 28 S. W. 274. The decision must be reversed and remanded to the Circuit Court of Appeals for determination of the law of Texas as applied to the circumstances of this case.

In view of the holding quoted from the opinion below, *ante*, p. 502, that to apply the laws of Texas to New York contracts when Texas citizens were parties would constitute an unwarranted extraterritorial control of contracts and regulation of business, it seems necessary to examine that position, as it may be determined upon remand that these are foreign contracts and under Texas law unenforceable as contrary to the public policy of Texas, because the assignees have no insurable interest. It would then be necessary to decide whether the courts of Texas could constitutionally apply Texas law to a foreign contract, valid where made, because such contract is contrary to the state's public policy.[4] If the Circuit Court of Appeals was correct in its view that the Constitution foreclosed application of such a Texas public policy to this case, the only question open on remand would be whether the contract sued upon was a Texas contract.

But the cases relied upon in the Court of Appeals to

---

[4] Cf. *Sampson* v. *Channell*, 110 F. 2d 754, 759.

support its holding [5] do not in our opinion decide this question. *Overby* v. *Gordon* holds that the adjudication of a probate court of Georgia that the decedent was a resident of that state was a proceeding *in rem* and did not bind the courts of the District of Columbia in a suit to determine anew decedent's domicile. *New York Life Insurance Co.* v. *Head* passed upon the application, by Missouri courts, of Missouri statutes, providing for an extension of insurance on default of premium, to an insurance contract assumed as of Missouri, though the insured at the time of issue and thereafter was a citizen of New Mexico. A New York loan agreement subsequent to the issuance of the policy between the insured and the Company, a citizen of New York, provided for extension after default, which was contrary to the Missouri statutes. This Court held the Missouri statutes were ineffective because the New York loan agreement was beyond Missouri's jurisdiction. The point that Missouri might refuse enforcement because the agreement, valid in New York, was contrary to the public policy of the former, was not discussed. In *Bond* v. *Hume,* a few years later, this Court reserved the principle here in question.[6] The *Aetna* case denied the constitutional power of the Texas courts to apply a Texas statute allowing a penalty and attorneys' fees against the company in a suit on an insurance contract made in a foreign jurisdiction with a person then a citizen of Tennessee, because

---

[5] *Overby* v. *Gordon,* 177 U. S. 214, 222; *New York Life Insurance Co.* v. *Head,* 234 U. S. 149; *Bond* v. *Hume,* 243 U. S. 15; *Aetna Life Insurance Co.* v. *Dunken,* 266 U. S. 389, 399.

[6] 243 U. S. at 25: "And of course we must not be understood as deciding whether the mere existence of a state statute punishing one who in bad faith, and because of such bad faith, had made an agreement to deliver in a contract of sale which would be otherwise valid, could become the basis of a public policy preventing the enforcement in Texas of contracts for sale and delivery made in another State which were there valid although one of the parties might have made the agreement to deliver in bad faith."

the "effect of such application would be to regulate business outside the State of Texas and control contracts made by citizens of other States in disregard of their laws under which penalties and attorney's fees are not recoverable." 266 U. S. at 399. The freedom from penalty and fee was deemed a part of the foreign contract and its effect on the public policy of Texas was not appraised.[7]

If upon examination of the Texas law it appears that the courts of Texas would refuse enforcement of an insurance contract where the beneficiaries have no insurable interest, on the ground of its interference with local law, such refusal would be, in our opinion, within the constitutional power of the Texas courts. Rights acquired by contract outside a state are enforced within a state, certainly where its own citizens are concerned; but that principle excepts claimed rights so contrary to the law of the forum as to subvert the forum's view of public policy. Cf. *Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 110; 120 N. E. 198. It is "rudimentary" that a state "will not lend the aid of its courts to enforce a contract founded upon a foreign law where to do so would be repugnant to good morals, would lead to disturbance and disorganization of the local municipal law, or in other words, violate the public policy of the State where the enforcement of the foreign contract is sought." *Bond* v. *Hume*, 243 U. S. 15, 21. Applying that reasoning, this Court affirmed the federal court in following Texas' decisions which refused to enforce a valid foreign contract of guarantyship against a married woman. *Union Trust Co.* v. *Grosman*, 245 U. S. 412. Likewise, state courts have been upheld in refusing to lend their aid to enforce

---

[7] Before *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, this Court decided as a matter of general law that where time of notice is important the foreign law governs. *Boseman* v. *Insurance Co.*, 301 U. S. 196, 202.

valid foreign contracts which required the doing of prohibited acts within the state of the forum. *Bothwell* v. *Buckbee, Mears Co.,* 275 U. S. 274, 278. Where this Court has required the state of the forum to apply the foreign law under the full faith and credit clause or under the Fourteenth Amendment, it has recognized that a state is not required to enforce a law obnoxious to its public policy. *Bradford Electric Co.* v. *Clapper,* 286 U. S. 145, 160, 161; *Hartford Indemnity Co.* v. *Delta Co.,* 292 U. S. 143, 150. The rule was not applied where the parties to the contract acquired rights beyond the state's borders with no relation to anything done or to be done within the borders. *Home Insurance Co.* v. *Dick,* 281 U. S. 397, 410.

In the *Head* case the foreign and local law differed as to the manner of extending insurance; in the *Aetna* case the difference arose from a local provision for attorney's fees and penalty; in the *Delta* case the time for notice varied in the two jurisdictions. In *New York Life Insurance Co.* v. *Dodge,* 246 U. S. 357, it was said that a statute of the state of the forum, regulating the application of insurance reserves in case of default of premium, was not effective, even though the insurance contract was a local contract and the insured a citizen of the state, to govern rights under a loan agreement made in a foreign jurisdiction. But these fall short of a public policy which protects citizens against the assumed dangers of insurance on their lives held by strangers. It is for the state to say whether a contract contrary to such a statute or rule of law is so offensive to its view of public welfare as to require its courts to close their doors to its enforcement.

*Reversed.*

MR. JUSTICE FRANKFURTER concurs in the result.