## UNITED SERVICES LIFE INS. CO. v. FARR et al.

District Court, S. D. New York.

April 21, 1945.

Murray, Kissam & Hayden, of New York City (Charles E. Powers, of New York City, of counsel), for plaintiff.

Henry Woog, of New York City, for defendant Farr.

Edward Thomas Moore, of New York City, for defendant Morrissey.

Parmly, Stetson, Woodward & Gaffney, of New York City (Warren N. Gaffney, of New York City, of counsel), for defendant Gallagher.

LEIBELL, District Judge.

This is an action of interpleader brought by an insurance company under 28 U.S.C.A. § 41(26), naming as defendants the insured's mother and aunt, who were the original beneficiaries of a policy of life insurance, and the widow of the insured, whom he later tried to substitute as a beneficiary. The proceeds of the policy ($5,008.90) have been deposited by the insurance company with the Clerk of this Court.

On November 1, 1941, Edward J. Gallagher, a First Lieutenant in the 165th Infantry, Company D, while stationed at Fort McClellan, Alabama, applied for a $5,000 ordinary life insurance policy of the United Services Life Insurance Company, a privately owned insurance company having its home office in Washington, D. C., and organized under the laws of the District of Columbia. It was not a government agency. Lt. Gallagher paid the initial monthly premium of $8.90 in cash at the time he made the application. At the request of the insured, the premiums under the policy were payable monthly by government allotment and at his request also the policy was issued as of December 1, 1941. It was received by Lt. Gallagher at Fort McClellan, Ala., from the soliciting agent, K. W. Kantz, on December 4, 1941. At that time Lt. Gallagher signed Exhibit 9, a post-card receipt for the policy, and gave the receipt to the agent, who returned it to the company. The policy named the insured's mother, the defendant, Mrs. Agnes Gallagher Farr, and his aunt, the defendant, Mrs. Regina Morrissey, with whom he had lived since boyhood, as co-beneficiaries.

Under the terms of the policy (Ex. 1) the insured reserved the right to change the beneficiaries. The policy provides:

"Change of Beneficiary.—The Insured, subject to any assignment of this Policy duly filed with the Company, may designate a new beneficiary or beneficiaries from

time to time by filing written request therefor at the Home Office, in such form as the Company may require; such change to take effect only when endorsed hereon by the Company at its Home Office during the lifetime of the Insured. * * *"

"Rights of Insured.—Subject to any endorsements hereon and to the rights of any assignee as above, the Insured, without the consent of the beneficiary, shall have the right to receive every benefit, exercise every option and enjoy every privilege conferred upon him by this Policy."

On the back of the policy there is a printed form to be filled in at the Home Office in order to register a change of beneficiary. It is set up as follows:

"Register of Change of Beneficiary

NOTE No change, designation or declaration of change of Beneficiary shall take effect until endorsed on this Policy by the Company at the Home Office.

| Date Endorsed | Beneficiary | Relationship | Endorsed by |
|---|---|---|---|
| | | | |
| | | | |

"

On April 18, 1943, Lt. Gallagher married the defendant, Mrs. Edward J. Gallagher, whom he had known since 1939, and to whom he had been engaged since November 10, 1941. At the time of the wedding, Lt. Gallagher was home on furlough from Hawaii, and his wife was able to be with him only until May 7, 1943, when he left the West Coast and returned to Hawaii.

On October 21, 1943, Mrs. Edward J. Gallagher received a V-mail letter from her husband, still in Hawaii, stating in part: "Been pretty busy during the past week. By the looks of things we'll continue to be busy, but I'll find time to write more often. Sent you a registered package day before yesterday. It contained a picture for your Aunt Kay and some insurance papers. I have had the beneficiary on the government policy changed to you. I also sent a letter to the insurance company in Washington, D. C. to change the policy to you but as yet haven't had a reply. Write them requesting a revised policy. Let me know what reply you receive."

Mrs. Gallagher received the package on October 16, 1943, which contained all that the Lieutenant stated. She received only

one letter from him after the V-mail letter. It was dated October 30, 1943. In addition to the expected expression of love for his wife, it states that he has "been going quite steadily lately" and that "there are times when it is just impossible to write regularly and there are going to be times in the future when I won't be able to write as often as I would like to". Lt. Gallagher was killed in action in the Central Pacific on November 21, 1943. His wife was notified December 10, 1943. (His application showed that his father was killed in the first World War.)

On December 12, 1943, Mrs. Gallagher wrote a letter (Ex. 3A) to the United Services Life Insurance Company stating that her husband had told her in a V-mail letter that he had directed the company to change the beneficiary of his policy to his wife. She requested the Company to notify her "whether the necessary change has been made or not". An office stamp on the back of her letter shows that it was received by the Veterans' Administration (a Government agency) on December 14, 1943. Another office stamp on the letter shows that the plaintiff insurance company did not receive the letter from the Veterans' Administration until March 23, 1944.

Not having received an answer to her first letter, Mrs. Gallagher wrote a second letter (Ex. 3B) to the insurance company on January 12, 1944. Again she explained the circumstances of the change of beneficiary, and asked to be told whether or not the change had been made. To this inquiry, she received a reply stating that the company had no information as to the change of beneficiary. The reply is not in evidence. She wrote a third letter (Ex. 3C) on January 18, 1944, offering to submit to the company any further proof it might consider necessary. Apparently, the insurance company's counsel wrote to Mrs. Farr, the mother of Lt. Gallagher, for there is in evidence (Ex. 4) a letter from her to the counsel, dated January 28, 1944. Part of this letter states: "This is to inform you that I was unaware of the existence of the above policy, but do recall that my son mentioned that he had named me beneficiary for some policy during 1941. It is requested that you inform me of the amount of this insurance and method of payment; also forward appropriate forms to file my claim."

The counsel for the company also wrote a letter (Ex. D) to Mrs. Gallagher, the

widow, on February 3, 1944, in which he stated:

"As our files do not indicate that a change of beneficiary notice ever was sent the insurance company by your husband, there is no alternative for me in the circumstances but to file an interpleader suit so that the court may determine who rightfully is entitled to the proceeds.

"However, I have taken the precaution of writing the Veterans' Administration to inquire if a change of beneficiary notice executed by your husband erroneously was received in that quarter. It sometimes happens that mail directed to us has gone to the Veterans' Administration. If there are any new developments from that source, I shall advise you."

The present action of interpleader was started on February 26, 1944. It was stated at the trial in October 1944 that the plaintiff insurance company had not succeeded in finding the letter from Lt. Gallagher, although a thorough search had been made. Even after the case was reopened in December 1944 to receive additional evidence on another point, it was stated that further search had failed to disclose Lt. Gallagher's letter to the insurance company requesting the change of beneficiary. A letter from the Veterans' Administration dated January 11, 1945 (Ex. 12) states that a very thorough search of the records under the name of Edward Gallagher failed to show any erroneously filed correspondence directed to the United Services Life Insurance Company, except the aforementioned letter of December 12, 1943, written by Mrs. Gallagher which was removed from the record and forwarded to the company about March 20, 1941. It also appears that some correspondence of the insurance company with its soliciting agent has been mislaid, or at any rate it was not in the company's files.

There has been no evidence showing when Lt. Gallagher's letter to the insurance company was written, but that it was written I haven't the slightest doubt. It must have been written some time between May 7, 1943, when the Lieutenant left the West Coast, and October 21, 1943, when his wife received the V-mail letter. A photostatic copy of the change of beneficiary made by Lt. Gallagher in his government insurance (Ex. C) is dated June 4, 1943 and is on a regular form of the Veterans' Bureau. Apparently units of the Army keep such forms on hand at army posts.

But forms for a change of beneficiary of a policy issued by a private insurance company, such as the United States Service Life Insurance Company, are not available at all camps and military outposts. "It has been the practice of the Company to provide these forms only upon the written request of the insured", according to a letter addressed to the Court by the insurance company's attorneys March 26, 1945.

■ In deciding who should receive the proceeds of the policy, on deposit with this Court, the first issue presented is this— what law governs the validity of the change of beneficiary. In determining that, I must follow the Conflict of Laws rule of the State of New York, in which this federal District Court is located. Klaxon Co. v. Stentor Co., 313 U.S. 487, at page 496, 61 S.Ct. 1020, at page 1021, 85 L.Ed. 1477; Griffin v. McCoach, 313 U.S. 498, at page 503, 61 S.Ct. 1023, at page 1025, 85 L.Ed. 1481, 134 A.L.R. 1462.

An insurance policy is a contract. "The New York rules of Conflict of Laws as to contracts are in great confusion. * * * At least five different ways of dealing with Conflict of Laws problems may be discerned". I will quote three of them—

"1. In some cases, the courts have used a single factor or contact as by itself determining the state whose law is to govern.

"2. In other cases, the courts have employed alternative specific factors, using the one or the other depending on which one will save the transaction.

"3. In a large number of cases, the courts have determined the governing law of the contract according to the grouping or massing of factors deemed most important for the purpose in hand." (Restatement of the Law of Conflicts of Laws, New York Annotations, p. 216.)

In Jones v. Metropolitan Life Ins. Co., 1936, 158 Misc. 466, 286 N.Y.S. 4, 6, Mr. Justice Sheintag discusses the New York Conflict of Laws rule in respect to contracts. The following is quoted from his opinion:

"The cases in New York take various positions on the question of which law governs the validity of a contract. In some, the place where the contract was made is said to be determinative. Straus & Co. v. Canadian Pacific Ry. Co., 254 N.Y. 407, 414, 173 N.E. 564; United States Mortgage & Trust Co. v. Ruggles, 258 N.Y. 32, 38, 179

N.E. 250, 79 A.L.R. 802. It is the opinion of an outstanding authority that this represents the present New York rule, unless there is a clear indication that the parties meant the contract to be governed by the place of performance. 2 Beale, The Conflict of Laws (1935) 1157. The view that the place of making governs has as a necessary concomitant, the theory that the place where the contract was made is the place where the last act legally necessary to effectuate a binding agreement took place.

"Other cases maintain that the contract is governed by the law of the place of performance. Manhattan Life Ins. Co. v. Johnson, 188 N.Y. 108, 113, 80 N.E. 658, 9 L.R.A.,N.S., 1142, 11 Ann.Cas. 223; Jewell v. Wright, 30 N.Y. 259, 264, 86 Am.Dec. 372; Curtis v. Delaware, L. & W. R. R. Co., 74 N.Y. 116, 120, 30 Am.Rep. 271. Still other cases rely on the intention of the parties to determine which law governs the contract. Wilson v. Lewiston Mill Co., 150 N.Y. 314, 323, 44 N.E. 959, 55 Am.St.Rep. 680; Stumpf v. Hallahan, 101 App.Div. 383, 386, 91 N.Y.S. 1062, affirmed, 185 N.Y. 550, 77 N.E. 1196. The last position that the cases take is the one which assumes that it is the grouping of the various elements which have gone to make up the contract that determines which law governs. Hooley v. Talcott, 129 App.Div. 233, 236, 240, 113 N.Y.S. 820; cf. Sliosberg v. New York Life Ins. Co., 244 N.Y. 482, 155 N.E. 749. This last position, in an extended form, has been espoused by an English authority as the method to be used in resolving conflict of law difficulties. Cheshire Private International Law, 183 et seq."

One problem arising at the outset is whether the basic question—who is the beneficiary—is one of "interpretation" of the contract, or of "performance". In Swift & Co. v. Bankers Trust Co., 1939, 289 N.Y. 135, at page 141, 19 N.E.2d 992, at page 995, a case involving the validity of certain checks drawn in one state and payable in another, Judge Lehman stated: " 'Interpretation' of a contract and its manner of performance are so intertwined that the courts often determine pragmatically the question whether the law of the place where the contract was made or the law of the place where the contract by its terms is to be performed regulates particular matters which 'bearing upon the interpretation' of a contract are at the same time 'connected with its performance.' Perhaps pragmatic determination may in such cases be indicated by the nature of the problem, and the test whether one rule or the other produces the best practical result may be the safest guide in the search for the intention, actual or assumed, of the parties."

But "the cases are not consistent on what law governs as to the person to whom the proceeds of an insurance policy are payable". Restatement of the Law of Conflict of Laws, New York Annotations, p. 246. If the question—who is the beneficiary—be considered a question of the interpretation of the policy, then the place of making the contract governs (32 Corpus Juris § 7 at p. 977); and the place of making the insurance contract can be ascertained by determining the time when it was made, i.e. when the transactions became obligatory on the parties as a contract. Restatement of the Law of Conflict of Laws, § 317; New York Annotations, p. 220.

§ 317 of the Restatement and the comment thereunder read as follows:
"§ 317. Insurance Policy Delivered by Mail.

When an insurance policy becomes effective upon delivery by mail, the place of contracting is where the policy is posted."
"Comment:

"a. A contract of insurance is sometimes a formal contract. In case it is an informal contract, if the offer is accepted by mailing the policy, the place of contracting is determined by the rule stated in § 325. The acceptance, however, may be held to come earlier, when the proper officer or officers of the company accept the offer, or to come later, when the policy is delivered to the assured. The time at which a contract of insurance becomes effective is a question of the law of insurance."

Section 325 referred to in the above comment reads as follows:—

"§ 325. Informal Bilateral Contract.

"In the case of an informal bilateral contract, the place of contracting is where the second promise is made in consideration of the first promise."

The finely printed paragraphs of the application (immediately above the signatures of the applicant, Lt. Gallagher and the soliciting agent, K. W. Kantz) read as follows:

"I agree that this application Part 1 and 2 shall be the basis of a contract of insurance under any policy that may be issued

834

pursuant hereto: That no statements, promises, or information made or given by or to the person taking this application, other than those contained herein, shall have any binding force on the Company; That the insurance hereby applied for shall not take effect until a policy shall have been actually delivered to and accepted by me, while I am in good health and the first premium shall have been paid or alloted to be paid during my continued good health. If, however, at the time of my signing the application, the full first premium is paid, then the insurance will take effect from the date of this application (subject to the provisions of the policy applied for), provided this application is approved at the Home Office of the company in Washington, D. C.

"That my acceptance of said policy shall constitute a ratification by me of any additions or corrections which the Company may make in the sections and part I entitled 'Corrections or Amendments'.

"Have you paid any portion of the premium hereon? If so, how much? $8.90 —Did you receive the conditional receipt bearing same number as this application in return for above payment? Yes.—Dated at Fort McClellan, Ala. This 1st day of November, 1941."

A sample of the "conditional receipt" above referred to (submitted to the Court as Exhibit 13 on March 26, 1945) is in the following form:

"Received from (Applicant) ....., .... Dollars, on account of application made this date to the United Services Life Insurance Company, Washington, D. C. If the sum collected at the time the application is signed is equal to the full first premium on the policy applied for and if such application is approved at the Company's Home Office for the class, plan and amount of insurance there applied for, then the insurance applied for shall be in force from this date but otherwise no insurance shall be in force under said application unless and until a policy has been issued and delivered, and the full first premium specified in the policy has actually been paid to and accepted by the Company during the lifetime and continued insurability of the applicant. The above sum shall be refunded if the application is declined or if a policy is issued other than as applied for and is not accepted by the applicant. This receipt is subject to the condition that any check or draft received may be handled for collection in accordance with the practice of collecting bank or banks, and this receipt shall be void if the full amount of such check or draft is not received by the company.

"Dated at ——— this ——— day of ———, 19—

"Agent ———
"————————"

The closing paragraph of the policy, above the signatures of the President and Secretary of the Insurance Company, states: "In Witness Whereof, the United Services Life Insurance Company has executed this contract at Washington, D. C. as of December 1, 1941 from which date all policy years and anniversaries are to be computed."

A form on the back of the policy states: "Date of Issue. Dec. 1, 1941."

The statement in the application (item 6 thereof) requesting that the policy be dated December 1, 1941, has no bearing upon the question of where the contract was made. If that request had not been made the coverage would have dated back to November 1, 1941, because the first full premium had been paid with the application dated November 1, 1941. The change requested in the application and approved by the company was that the policy be dated December 1, 1941. In either case, whether the coverage was to be from November 1st or December 1st, 1941, the contract of insurance was made when the application was approved at the Home Office of the company at Washington, D. C., and it was there that the policy was executed December 1, 1941, by the officers of the company as stated in the policy. 32 Corpus Juris § 8 p. 979; Stone v. Penn Yan, K. P. & B. Ry., 197 N.Y. 279 at page 285, 90 N.E. 843, 134 Am.St.Rep. 879; 33 Harvard Law Review 303. Nothing further remained to be done to make it a binding insurance contract, and the law of the District of Columbia would apply to questions involving the interpretation of the contract. The steps later taken to deliver physical possession of the policy to the insured were not determinative of when or where the contract was made.

If the law of the place of performance governs in determining the effect to be given to the insurer's efforts to change the beneficiary, then the law of the District of Columbia would again apply. The policy states that the Company "immediately upon receipt at its Home Office in the City

of Washington, D. C., of due proof of the death of the Insured, occurring while this Policy is in force, agrees to pay Five Thousand Dollars ($5,000) at its Home Office in the City of Washington to" the beneficiaries who were named in the policy, the mother and aunt of the insured. It seems to be clear therefore that the District of Columbia was the place of performance of the insurance contract. See sections 358 and 366 of the Restatement of the Law of Conflict of Laws.

If the question of which law governs is to be determined by the most important groupings of the various elements that go to make up the contract then it seems that the law of the District of Columbia would again prevail. It was there that the Company was incorporated and had its home office; it was there that the insured's application was approved; it was there that the policy was executed; and it was there that the allotments from the Lieutenant's pay were to be applied to the payment of the premiums. Further, it was in the District of Columbia that the contract was to be performed by the Company. As against those elements we have the application signed by the insured in the State of Alabama, the first premium paid there in advance at the time the application was signed, and the policy delivered by the Company's agent to the insured in that State. But the delivery of the policy by the agent was ministerial only, the contract having already been made when the application was approved and the policy issued at the home office in Washington, the first premium having been paid with the application. However, there is little difference between the law of the District of Columbia and that of the State of Alabama, as to the effect to be given to the insured's efforts to change the beneficiary of a policy if he has done all that could reasonably have been expected of him under the circumstances.

There has been some discussion in the briefs of counsel on the question of when the policy was "delivered". Although I believe it has no bearing in this case on the question of where the contract of insurance was made, I wish to express my reasons for concluding that the "delivery" of the policy took place at Fort McClellan, Ala. The policy was mailed from the home office of the insurance company at Washington, D. C. to K. W. Kantz, the soliciting agent. The agent Kantz personally delivered the policy to Lt. Gallagher at Fort McClellan, Ala., and had him sign a form of receipt printed on the back of a post-card (Ex. 9) reading as follows:

"United Services Life Insurance Co.
Washington, D. C.

"Received of United Services Life Insurance Company, Policy No. 7070, this 4th day of Dec., 1941.

"Dated at Fort McClellan, Ala.
"Edward J. Gallagher
"Insured

"K. W. Kantz
"Witness

"Please Return This Receipt At Once"

The date was filled in by the agent Kantz. The number of the policy 7070 appears to have been stamped by the same numbering machine as stamped the same number on the policy. The post-card receipt was mailed by Kantz in an envelope, from either Anniston, Ala., or Atlanta, Ga., to the insurance company at Washington, D. C., where it was received December 8, 1941.

The application for the policy, in item 26 of Part 1, contains the printed request "Send policy to ——— Address ———". In the space alongside the printed words is the name K. W. Kantz in the handwriting of Kantz. The application was signed by Lt. Gallagher. This gives rise to the question—Whose agent was Kantz in receiving the policy? Concededly he was the soliciting agent for the insurance company. According to Kantz, the practice at the time was for the insurance company to mail policies to agents for delivery to the insured. That may be why he wrote in his own name as the person to whom the policy was to be sent.

Did Lt. Gallagher make Kantz his own agent to receive the policy, by signing an application containing the request that the policy be sent to Kantz? If he did, then the delivery of the policy to the insured was made when the policy was mailed at Washington, D. C., in an envelope addressed to the agent Kantz. See section 317 of the Restatement of the Conflict of Laws, which "is probably in accord with the law of New York". N. Y. Annotations, p. 220. See also Justice Sheintag's comments in Jones v. Metropolitan Life Ins. Co., supra.

■ The District of Columbia Code, § 35—704(5), prohibits the inclusion in a policy of "A provision to the effect that the agent soliciting the insurance is the

agent of the person insured under said policy, or making the acts or representations of such agent binding upon the persons so insured under said policy." The plaintiff insurance company was organized under the laws of the District of Columbia. The designation of the soliciting agent, Kantz, in the application for the policy, as the person to whom the policy was to be sent, would run counter at least to the spirit of the above provision of the District of Columbia Code, if Kantz is assumed to have been acting as the agent for the insured. If Kantz in receiving the policy was acting as the agent of the company, and I believe he was, then the mailing of the policy from the home office at Washington, D. C., to the agent Kantz, would not constitute a delivery of the policy at Washington, D. C. The delivery would be at the place where the agent in turn handed the policy to the insured, in the State of Alabama. See section 318 of the Restatement of the Conflict of Laws, which is in accord with the law of New York. N. Y. Annotations, p. 220.

Under the law of the District of Columbia and of the State of Alabama the provisions of the policy are liberally construed in recognizing an insured's attempt to change the beneficiary of a policy, wherein the right to make the change is specifically reserved by the insured. If the insured has taken all reasonable steps required by him to be performed, even though the insurer has not completed all the mechanical or ministerial acts on its part, prior to the death of the insured, the change will be recognized.

In the District of Columbia it has been held that there are exceptions to the general rule that the insured is required to change the beneficiary of a life insurance policy according to the rules laid down by the insurer and as contained in the policy; among those exceptions are (1) if it is beyond the power of the insured to comply literally with the regulations, a court of equity will treat the change as having been legally made; (2) if the insured has pursued the course pointed out by rules of the insurer, and has done all in his power to change the beneficiary, but, before the new certificate is actually issued, he dies, a court of equity will treat such certificate as having been issued, and will decree accordingly. Requirements in a policy of the character which required the insured to surrender and return the policy for indorsement or issuance of a new certificate are made for the protection of the insurer, and if complied with to its satisfaction or if waived by it during the lifetime of the insured, cannot be availed of to support the claim of a former beneficiary. The beneficiary of a policy in which the right to change the beneficiary is reserved, receives no vested right, but only an expectancy which may be defeated at any time by the insured. Supreme Council of Royal Arcanum v. Behrend, 247 U.S. 394, 38 S.Ct. 522, 62 L.Ed. 1182, 1 A.L.R. 966; Berkeley v. Harper, 3 App.D.C. 308; Shenandoah Life Ins. Co. v. Hunter, 2 Dist.Ct.D.C.,N.S., 99.

In Alabama, too, the courts have held that where the insured has done everything in his power to change the beneficiary, and dies before the insurer performs its part in making the change, a court of equity will treat it as having been done. The specific requirements for effecting the change set up by the insurer are for its advantage, and if it fails to take advantage of it there is a waiver, and no one else may do so. Whitman v. Whitman, 225 Ala. 113, 142 So. 413, affirmed 226 Ala. 701, 147 So. 921; McDonald v. McDonald, 212 Ala. 137, 102 So. 38, 36 A.L.R. 761; Phillips v. Phillips, 240 Ala. 148, 198 So. 132.

Whether the law of the District of Columbia or that of the State of Alabama is applied, it has been sufficiently established that the insured took all the steps required of him and that he could reasonably be expected to take under the facts and circumstances surrounding his request to change the beneficiary. Sitting as a court of equity, full effect will be given to the clearly expressed intention of the insured to make his wife the beneficiary of the policy and he will be deemed to have accomplished that change, having done all that he could be expected to do while in the armed forces of his country, preparing for battle at a distance of some 5500 miles from the main office of the insurance company. His widow, Marie Gallagher, sued herein as Mrs. Edward J. Gallagher, named as a defendant herein, is entitled to the proceeds of the policy.

Lieutenant Gallagher's use of a letter to the company, instead of some printed form, is immaterial because the policy requirements as to change of beneficiary are that the insured file "written request therefore at the Home Office in such form as the company may require". Equity

would not permit the insurer arbitrarily to reject a clear expression of the intent of the insured to change the beneficiary, nor to insist on the use of some special form, which would simply differ in language. The endorsement on the policy is a mere ministerial act of the company, since the change in beneficiary is no longer considered a change in the insured risk. Carnahan, Conflict of Laws and Life Insurance Contracts, 300.

In Prudential Ins. Co. of America v. Moore, 7 Cir., 145 F.2d 580, at page 581, Circuit Judge Evans stated:

"Passing on the necessity of the company's notifying the insured of its recognition of a change in beneficiary before the change is effective, the courts of the land have spoken rather frequently. From a study of these decisions, we find the following statement to have the support of the great weight of authority.

"A change of beneficiary may be accomplished without a strict or complete compliance with the conditions of the policy regarding the endorsement of the insurer. The endorsement of a change of beneficiary by an insurer is purely a ministerial act which the company can not refuse to perform and a failure on its part to perform such act will not defeat the change, if the insured has done everything within his power to effect a change." A footnote to the Court's opinion contains a long list of cases to support that statement. See, also 37 Corpus Juris, § 350, p. 584.

"Neither logic nor policy requires such close attention to technicalities and sacrificing of substance for form. By the very reservation of the right to change the beneficiary, the insured has evidenced an intention to retain full control over the proceeds of the policy". 42 Harvard Law Review p. 250. A footnote (No. 26), to the article from which the above is quoted, states: "The courts in war risk insurance cases have not required strict compliance with the regulations, and in some cases, desiring to carry out the insured's intent, have been satisfied with evidence of intent." Claffy v. Forbes, D.C.W.D.Wash.1922, 280 F. 233; Peart v. Chaze, D.C.W.D.La.1926, 13 F.2d 908.

■ The requirements of notice and endorsement are obviously for the protection of the company. Strict compliance with these requirements simplifies the work of the company and allows the company to make an immediate payment on proof of death to the beneficiary named in the policy. However, in situations like the present, disputed questions of law and fact come to the attention of the company before payment is made, which the company may not wish to resolve. Interpleader gives the company a procedure by which it can bring all of the parties into court, and have the questions of law and fact between the claimants resolved without any special consideration of the protection of the insurance company entering into their decision.

The courts should not be too exacting in insisting on formalities in the execution of legal papers by men in service, especially in the case of those who are about to enter a combat area (in expeditionibus) and are busy with military preparations, with very little time to look after their personal affairs. At such a time they naturally think of their obligations to those at home and of what effect their death in battle might have upon the fulfillment of those obligations. A soldier's estate frequently is only his life insurance. For policies issued through the Veterans Administration for National Service Life Insurance there are available at the army station forms for the change of beneficiary, such as Exhibit C, which was executed by Lt. Gallagher June 4, 1943, in the presence of Capt. Morrell, a Personnel Officer of the 165th. That form probably was executed in Hawaii where the 165th was then stationed. Commercial life insurance companies do not maintain such a convenient service at army bases, with blank forms for the change of beneficiaries. Hence there is every reason for giving effect to the intention of the insured service man in making a change in the beneficiary of such a policy, if the intention is clearly expressed in the insured's own handwriting, even though he has not complied with all the formalities required by the policy to effectuate the change. In deciding whether he has done all that he could reasonably be expected to do under the circumstances to comply with the technical requirements of the policy, we should try to place ourselves in his position.

It has been argued that Lt. Gallagher should have sent the policy to the insurance company direct, to have the change endorsed thereon. He had written a letter to the company and he had received no reply. That might explain why he did not forward the policy to the company. He

sent the policy to his wife, registered mail, together with some other papers, including a copy of his National Service Life Insurance policy, which he had also changed by naming his wife as beneficiary instead of his mother. He instructed his wife in the V-mail letter she received October 21, 1943 (Ex. A–1) to write the United Services Life Insurance Company "requesting a revised policy", as he put it. It was no fault of Lt. Gallagher's that his letter to the company was not received by the company. But there is no doubt that he wrote the company. If he had not, why did he write to his wife that he had written the company and why did he send her the policy and give her instructions to get a "revised policy" from the Company? His intention to make her the beneficiary is unchallenged by any evidence.

Even if his wife had acted promptly it is not certain that the proof she had of the insured's request (the V-mail letter to his wife) would have satisfied the insurance company, or that the company would have endorsed the change of beneficiary on the policy, although in my opinion they should have done so. The fact that his wife's delay is involved, should not militate against giving effect to the intention of the insured, her husband, that she should have the proceeds of the policy.

Perhaps she, too, did not understand all about the formalities required to change the beneficiary under the terms of the policy. How many people read their own life insurance policies? In this case the widow of Lieutenant Gallagher should not be penalized because she did not act more quickly. The V-mail letter she received from her husband bears a postmark showing that it arrived in New York on October 21, 1943. Lt. Gallagher was killed in action on an island in the Pacific one month later, November 21, 1943.

In a somewhat similar case, Matter of Hickey's Estate, 1920, 113 Misc. 261, 184 N.Y.S. 399, 400, Surrogate Foley admitted to probate portions of two letters written by a soldier, dated May 26, 1918, and August 6, 1918, while in active service in the United States Army during the first World War. The letters were written while he was a patient in a hospital. He died October 20, 1918. In the opinion he filed in that case the Surrogate referred to an earlier New York case in which a Captain's letter to his sister had been admitted to probate as a valid will, and added "The theory of the law is that, from the absolute necessities of military service, the solemn and formal rules as to testaments are relaxed in favor of soldiers." However, a later ruling of the New York Court of Appeals in Re Zaiac's Will, 1939, 279 N.Y. 545, 18 N.E.2d 848, held against the admission of a soldier's letter as a holographic will, because it was not attested by two witnesses pursuant to the New York statute. But in May 1942 there was added to § 16 of the New York Decedent Estate Law, relating to nuncupative wills, a subsection which specifically provided that "A holographic will when written entirely in the handwriting of the maker even though the same be unattested", is a valid will. This amendment was discussed in an article on Soldiers' and Sailors' Wills published in Vol. 12, Fordham Law Review, p. 80, which gives the history of the very ancient dispensation granted soldiers and sailors in respect to wills made "in expeditionibus", dating back to the time of Caesar's Gallic Wars.

In the case of Claffy v. Forbes, supra, 280 F. 233, 235, Judge Neterer expressed this view in picturesque language: "Throughout the history of the civilized world, since the decrees of Julius Caesar, the intention and wish of the soldier, with relation to designation of beneficiary or disposition of property, killed in the line of duty, has been carried out when ascertained, whether it was scrawled in the sand with the point of his sword, or written on the scabbard of his sword or his shield (The Customs of Duchy of Burgundy, printed at Dijon, 1694, p. 410; Coutumes de Paris, column 51, Paris, 1714); and remedial justice requires, under the facts in this case, that the designation of the niece in the letter to the mother be established from the date of presentation to and record thereof by the Bureau of War Risk Insurance."

The above statement was quoted and applied in Part v. Chaze, supra, 13 F.2d 908.

Both the District of Columbia and the State of Alabama have statutory provisions giving effect to the nuncupative wills of soldiers in actual military service, in disposing of personal property. Dist. of Col. Code, Title 19, § 201. Code of Alabama, Title 61, §§ 28–30.

The plaintiff insurance company will submit an appropriate decree herein awarding to the claimant, Marie Gallagher, sued herein as Mrs. Edward J. Gallagher, the proceeds of the policy on deposit with the

Clerk of this Court, less the Clerk's fees and less an allowance of $250 to the plaintiff for its costs, counsel fees and expenses in this interpleader action.