**F. C. GAINES, Jr.,**

v.

**R. Downs POINDEXTER.**

Civ. A. No. 6176.

United States District Court
W. D. Louisiana,
Shreveport Division.

Oct. 8, 1957.

John M. Hamilton, Witts, Geary, Hamilton & Brice, Dallas, Tex., J. Edwin Bailey, Jr., Shreveport, La., for plaintiff.

Sidney M. Cook, Charles D. Egan, Benjamin C. King and Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendant.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

F. C. Gaines, Jr., here sues R. Downs Poindexter for $1,450,000 in damages. The claim results from defendant's having allegedly alienated the affections of plaintiff's wife.

Jurisdiction is based solely on the Diversity Statute, 28 U.S.C.A. § 1332, plaintiff being a resident citizen of Dallas, Texas, and defendant of Shreveport, Louisiana.

The complaint sets forth a sordid story: Plaintiff was married to Miriam Janis on June 11, 1944, at Dallas, where they and their three children, born of the marriage, lived together happily until July, 1956. At that time plaintiff introduced defendant, a business friend, to his wife. Almost immediately, it is alleged, defendant launched a campaign to steal Mrs. Gaines' affections. Using his wealth, and displaying a glamorous background of expensive clothes, luxurious cars and a private airplane, defendant is said to have showered the wife with valuable gifts and other attentions which completely turned her head, caused

her to abandon all devotion to her family, and to engage in clandestine trysts at a secret apartment maintained by defendant for that purpose. As the end result, it is averred that the marriage has been ruined, the family destroyed, and motherhood profaned, all because of defendant's calculated and perfidious course of conduct.

For this, apparently not being averse to advertising the facts he alleges, plaintiff claims the large amount of damages we have mentioned. He evidently feels that, in some manner or measure, money will make him and his family whole again.

Through counsel, defendant has moved to dismiss the complaint for failure to allege a claim upon which relief can be granted. The points of the motion are that the law of Louisiana reprobates actions for damages because of alleged alienation of affections, they being abhorrent to the public policy of the State; that in a case like this, where jurisdiction depends entirely upon diversity of citizenship between the parties, this Court sits, and should act, exactly as would a Court of the State; that while this claim arises under the law of Texas, which sanctions such suits, and while the rule of comity ordinarily requires the Courts of the State where suit is filed to recognize and enforce the law of another State from which a transitory cause of action arises, such recognition and enforcement will not be granted where the law of the foreign State is repugnant to the established public policy of the forum; hence, since a Louisiana State Court would dismiss the action, this Court also should do so.

For his part, in opposition to the motion, plaintiff urges that this Court judicially must recognize the law of Texas, where his cause of action arose, and must enforce it, since it is a transitory claim enforceable in the State of defendant's residence; that all requirements for the exercise of valid jurisdiction are present; and that, therefore, the motion should be denied.

Resolution of these legal issues will require analysis of 1) the Louisiana law on the subject of alienation of affections, 2) the extent to which such law establishes a rule of State public policy, 3) the practical effect of such policy, and 4) the Louisiana conflict of laws rules applicable to this case.

The first and only alienation of affections litigation in the history of Louisiana is Moulin v. Monteleone, 165 La. 169, 115 So. 447, 456, decided by the State Supreme Court in 1928. There, in the face of factual allegations remarkably similar to those alleged here, the Court dismissed that suit on an exception of no cause or right of action. Its unanimous opinion, authored by Chief Justice O'Niell, in an exhaustive, scholarly discourse, covered every phase of applicable Louisiana law, and concluded that such an action may not be maintained in this State, for these principal reasons:

1. The type of damages sought in such cases is essentially punitive or exemplary. Louisiana law denies recovery of such damages.

2. "The law considers marriage in no other view than as a civil contract", LSA–Civil Code Article 86; and in this State there is no right of action for damages *ex delicto* against one who induces another to violate his or her contract with a third person.

3. Under Louisiana's general civil law, in the absence of a statute or codal article expressly granting the right, there can be no recovery for loss of services, support, companionship, or affections of a human being, the enjoyment of which is not a property right.

4. An action for alienation of affections is not provided for, expressly or impliedly, by LSA–Civil Code Article 2315, which serves as the general basis of Louisiana tort law.

5. Since the Louisiana Civil Code contains no positive law granting a right of action for alienation of affections, the Court would look to natural law and reason, and received usages, which in this

case required a holding that the plaintiff could not recover.

In its concluding paragraph, the decision pointed directly to the core, the *raison d'etre,* of the State's public policy on this subject:

> "The best way to suppress such conduct as is described in the plaintiff's petition would be by means of a penal statute condemning both of the particeps criminis. *A law that would allow the husband compensation in money for such a wrong would be revolting to a majority of men, and might tend more to encourage blackmail than to protect the home. It is not astonishing that the Civil Code makes no provision for such a right of action."* (Emphasis supplied.)

Nearly thirty years have passed since that decision was rendered by the State's highest Court. No further cases of that nature have been filed. The Legislature has met dozens of times in the interim, and, by way of tacit endorsement, not only has not taken even a first step toward modifying or revoking the rule; so far as we know, or have been advised, there never has been any effort from any quarter to effect a change. The decision has been universally recognized and applauded in Louisiana for what it is—a sound and basic tenet of State public policy. Among others, leading legal scholars of our State Law Colleges have added their approval.

Dr. Dale E. Bennett, Professor of Law at Louisiana State University, at 1 Louisiana Law Review 665, 672, made the following statement:

> "Louisiana jurisprudence is fortunately free from such cases. In the landmark case of Moulin v. Monteleone, Chief Justice O'Niell, in a scholarly and forceful opinion, held that Louisiana has never recognized a cause of action for alienation of affections. Other courts have recognized the evil, and eight states have recently enacted statutes abolishing the common law cause of action for alienation of affections.

> *    *    *    *    *    *

> "In Miller v. Levine, 1931, 130 Me. 153, 154 A. 174, 178 the court declares, 'such suits furnish a most convenient weapon for extortion and the right to bring them is a constant temptation to the unscrupulous.'

> *    *    *    *    *    *

> "The *social policy* underlying this decision is exemplified in the Chief Justice's conclusion, 'A law that would allow the husband compensation in money for such a wrong would be revolting to a majority of men, and might tend more to encourage blackmail than to protect the home.' " (Emphasis supplied.)

Professor Ferdinand Fairfax Stone, of the College of Law, Tulane University, in a comment at 17 Tulane Law Review 159, 160, made the following statements:

> "Thus, to offer an example, when Chief Justice O'Niell decided in the case of Moulin v. Monteleone that Louisiana would not recognize an action for damages for alienation of affections, he was determining in a sense that the considered attitude of this community as represented in its laws and the experience of the years did not favor the granting of damages as redress in such instances.

> *    *    *    *    *    *

> "Even in recent times, Chief Justice O'Niell in referring to Moulin v. Monteleone, a suit for alienation of affections, stated that in his view the plaintiff had not lost anything, but had merely learned something."

Dr. Harriet S. Daggett, Professor of Law, Louisiana State University, in her work entitled The Community Property System of Louisiana, at page 216, stated:

> "The budding of a line of alienation of affection suits was promptly and effectively nipped in the case of Moulin v. Monteleone, where in another renowed opinion, Chief Justice O'Niell denied the compatibility of real affection with a salve of money damages. The whole relationship of husband and wife was

raised to a higher level by his words. The contrast to the common law is most strikingly brought out in the opinion and is most gratifying to the group of individuals who had been branded by Blackstone as 'the inferior' and for whom no legal relief was available when the affections of a spouse had been alienated."

Moreover, it is a matter of common knowledge, properly subject to judicial notice, that the Bench and Bar of Louisiana agree with the soundness of Moulin v. Monteleone, especially with its finding that the sanctioning of such litigation "* * * might tend more to encourage blackmail than to protect the home."

■ Other States, throughout all parts of the nation, have taken the same realistic view. New York, Pennsylvania, Florida, California, Maine, New Jersey, Alabama, Colorado, Illinois, Indiana, and Michigan, by special statutes, have outlawed their old rules permitting recovery of damages for alienation of affections. See, e. g., Kolkey v. Grossinger, 5 Cir., 195 F.2d 525. That Louisiana has not done so by express legislative action does not render the rule, established by its Supreme Court through interpretation of the Civil Code—itself a statutory enactment—any less effective as a firm pronouncement of State public policy. Such policy is to be found, not only in the Constitution or Statutes of a State, but in the decisions of its highest Court. So said the United States Supreme Court in United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 559, 41 L.Ed. 1007:

"The public policy of [a] government is to be found in its statutes, *and, when they have not directly spoken, then the decisions of the courts.*" (Emphasis supplied.)

To the same effect are Griffin v. McCoach, 5 Cir., 123 F.2d 550, and W. L. Slayton & Company v. Newton & Morgan, 5 Cir., 299 F. 279, 280. In the latter case the Court said:

"The sources of the public policy of a state are the Constitution, the laws, *and the judicial decisions of the court of last resort of that state.* Order of St. Benedict v. Steinhauser, 234 U.S. 640, 34 S.Ct. 932, 58 L.Ed. 1512, 52 L.R.A.,N.S., 459, Ann.Cas. 1917A, 463; Couch v. Hutchinson, 2 Ala.App. 444, 57 So. 75; 6 R.C.L. 710." (Emphasis supplied.)

■ We find, accordingly, that it is the settled public policy of Louisiana to bar the doors of its Courts against suits for damages, resulting from alleged alienation of affections, originating in this State. Plaintiff's counsel concede as much in their brief where they say "* * * suits for alienation of affections arising in Louisiana are against the public policy of Louisiana * * *".

What of extra-state causes of action of the same nature, coming here from jurisdictions such as Texas, which allow prosecution of these claims, Swearingen v. Bray, Tex.Civ.App., 157 S.W. 953; Smith v. Smith, Tex.Civ.App., 225 S.W. 2d 1001?

Will Louisiana Courts, State or Federal, entertain such actions in the face of the state's settled policy on that subject? This brings us directly to consideration of the conflict of laws question which thus is presented.

■ Since its decision in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, requiring Federal Courts, in cases where jurisdiction is based solely upon diversity of citizenship, to follow the State's substantive laws, the United State Supreme Court, in Guaranty Trust Company v. York, 326 U.S. 99, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079, has declared:

"A federal court adjudicating a state-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State."

In another extension of the Erie doctrine, the Supreme Court has held that Federal Courts also must apply the conflict of laws rules prevailing in the Courts of the State in which they sit. "Otherwise, the accident of diversity of citizenship would constantly disturb equal administration of justice in coordi-

nate state and federal courts sitting side by side." Klaxon Co. v. Stentor Electric Manufacturing Company, 313 U.S. 487, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477. To the same effect is Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481. Therefore, we here must seek to determine and apply the Louisiana conflict of laws rules as to the State's recognition *vel non* of extra-state claims of this or a similar nature; and attempt to reach the same result as if the matter had been presented in the State Court. Guaranty Trust Company v. York, supra; Cooper v. American Airlines, Inc., 2 Cir., 149 F.2d 355; Big State Barging Company v. Calmes, D.C., 138 F.Supp. 891.

■ Louisiana does not have a conflict of laws rule directly and particularly deciding whether an alienation of affections claim arising outside the State will or will not be enforced here, i.e., the Louisiana Courts have not had occasion to pass upon that precise question. In other cases, however, involving the same general principle as this one, the State Courts have held that they will not recognize or enforce an out-of-state cause of action which conflicts with Louisiana's public policy.

In Brinson v. Brinson, La., 96 So.2d 653, 658, finally decided by the Louisiana Supreme Court on June 28, 1957, there was an attempt to obtain recognition by Louisiana's Courts of an out-of-state "common-law marriage", contracted in bad faith in Mississippi. On original hearing, through Justice McCaleb, the Court said:

"But, should we be mistaken in our interpretation of the views of the Mississippi Supreme Court with relation to common-law marriages, there is *another ground* on which we rest our decision in refusing to sanction plaintiff's claim. *This is that it would be contrary to the public policy of this state to hold that a bigamous marriage contracted in bad faith in another state may nevertheless produce its civil effects under our law.* While this Court has heretofore recognized, as a matter of

comity, common-law marriages valid where contracted, none of the cases has involved a situation like this where the alleged common-law marriage is the outgrowth of a ceremonial marriage, void at its inception and contracted in bad faith by both parties.

"*It is a well established rule of conflict of laws that the spirit of comity between states does not require a state to recognize a marriage which is contrary to its own public policy.* Succession of Gabisso, 119 La. 704, 44 So. 438, 11 L.R.A.,N.S., 1082; 55 C.J.S. Marriage § 4, pp. 813 and 814. The public policy of this state with respect to the effects produced by a null marriage is to be found in our Civil Code *and jurisprudence.*

"Articles 117 and 118 of the Civil Code, which treat of the civil effects of null marriages, affirmatively state that no civil effects can flow from a marriage which is null unless the claimant was in good faith. Hence, since our Code and jurisprudence (see Thomas v. Thomas, 144 La. 25, 80 So. 186, and Dillon v. Traders & General Ins. Co., La.App., 183 So. 553) require absolute good faith on the part of a spouse claiming the civil effects of a bigamous union, *it would be inimical to public policy for this Court to conclude that such a relationship,* conceived in bad faith, *will be given effect in Louisiana merely because it may be sanctioned in the state wherein it existed.*" (Emphasis supplied.)

On rehearing, through Justice Hamiter, the Court reiterated and strengthened what it already had said:

" * * * 'If the marital status has been acquired by a violation of an express provision of the positive law of the state in which its recognition is asked, *or if it is contrary to the spirit and genius of its institutions or opposed to its settled policy or the good order and well being of its society, or to its conceptions of*

*public morality and decency, in all such cases the status would not and should not be recognized by the courts of such state.'* And in 55 C.J.S., Marriage § 4(2), this is said: 'The rule that the lex loci contractus is controlling as to the validity of a marriage rests on comity alone, and an exception thereto exists where the marriage is repugnant to the public policy of the domicile of the parties or is contrary to its positive laws.' (Italics ours.)

"For us to recognize as a valid marriage the mere continuation of the meretricious relationship as existed between plaintiff and decedent—that which commenced in bad faith and continued without those persons having entered into a ceremonial marriage or a specific marital agreement subsequent to the removal of the impediment—would be contrary to our public policy, opposed to the well being of society, and violative of the spirit of our laws concerning the institution of marriage."

In an earlier case, while Justice McCaleb was a member of the Louisiana Court of Appeal for Orleans Parish, he served as the organ of the Court in Moore v. Burdine, La.App., 174 So. 279, 282. In that litigation there was a Mississippi contract of employment, scheduled for performance in Louisiana, the terms of which were in violation of a Louisiana law. In resolving the conflict of laws question presented, the Court said:

"* * * Hence, the fact that the agreement was made in Mississippi is immaterial, inasmuch as *our courts cannot enforce contracts contrary to the public policy of this state.* As a matter of comity between the several states, the court will apply the law of the place where the contract is made in preference to the law of the forum. But the comity extended by one state, in the application of the law of another state,

is subject to certain well-defined limitations and restrictions, and *it is firmly established that the law of the place where the contract is made will not be given effect when to do so will be contrary to the settled public policy of the forum.* See 12 Corpus Juris, 439." (Emphasis supplied.)

To the same effect are the earlier decisions of this Court in Metropolitan Life Ins. Co. v. Richardson, D.C., 27 F.Supp. 791, 795, and Metropolitan Life Ins. Co. v. Haack, D.C., 50 F.Supp. 55. See also Bergeron v. Mumphrey, La.App., 38 So. 2d 411.

11 Am.Jur. 495, verbo "Conflict of Laws", § 183, makes the following pronouncement on this subject:

"It is conceded by all the courts that it is not strict right, but comity, which enables one to bring an action in one state or country for a tort * * * caused by another, and that *under the principles of comity, such action will not be entertained if it would violate the public policy of the forum. Thus a state may refuse the maintenance of an action on a tort arising elsewhere.*" (Emphasis supplied), citing T[exas] & P. R. Co. v. Humble, 181 U.S. 57, 21 S.Ct. 526, 45 L.Ed. 747, and other decisions.

54 Am.Jur. 981, verbo "United States Courts", § 357, also states:

"*Federal Courts are bound by the decisions of the state courts in respect of* rules of conflict of laws or of *local public policy* against the enforcement of rights acquired in another state * * *". (Emphasis supplied.)

158 A.L.R. 629, concludes:

"Although a contrary result has been reached, it has been held, in what seem to be *the better-reasoned cases, that an action for alienation of affections* or breach of contract to marry *may not be maintained in a Federal court sitting in a jurisdiction where such actions have been abolished* under the terms of a stat-

ute declaring, either expressly or in effect, that *the maintenance of such actions is contrary to the public policy of the state, even though the cause of action arose in a jurisdiction where such an action would be recognized.*" (Emphasis supplied.)

21 A.L.R.2d 261, § 4, further states:

"Ordinarily a right or obligation arising under foreign law will not be enforced *where it is against the public policy of the forum.* For the purpose of this rule, *a federal court in diversity of citizenship cases is bound,* under the doctrine of Erie R. Co. v. Tompkins, and subject to its limitations, *to follow the public policy of the state in which it is sitting.*" (Emphasis supplied.)

To the same effect are these decisions by the Fifth Circuit Court of Appeals: Palmer v. Chamberlin, 191 F.2d 532; Tademy v. Scott, 157 F.2d 826; and Hamilton v. Glassell, 57 F.2d 1032; also see A. B. v. C. D., 3 Cir., 36 F.Supp. 85.

Restatement, Conflict of the Laws, § 612, p. 731, sums it up:

"No action can be maintained upon a cause of action created in another state, the enforcement of which is contrary to the strong public policy of the forum."

Davidson v. Gardner, 7 Cir., 172 F.2d 188, cited by plaintiff, and Stephenson v. Grand Trunk Western R. Co., 7 Cir., 110 F.2d 401, not cited, were expressly overruled in Trust Co. of Chicago v. Pennsylvania R. Co., 7 Cir., 183 F.2d 640, 21 A.L.R.2d 238. Wawrzin v. Rosenberg, D.C., 12 F.Supp. 548, also cited, has been distinguished, shown to be outmoded, and tacitly overruled by later Supreme Court decisions, in Fahy v. Lloyd, D.C., 57 F.Supp. 156. The other authorities cited by plaintiff are clearly distinguishable or are not in point.

From this review of the Louisiana jurisprudence, and the majority rule prevailing elsewhere, we are convinced that, had this suit been filed in a Court of this State, instead of here, the State Court surely would conclude that the cause of action alleged is unenforceable in Louisiana, even though it arose in Texas where such actions are cognizable. This would be held because a claim of this nature is "* * * contrary to the spirit and genius of [Louisiana's] institutions * * *", "* * * opposed to its settled [public] policy * * ", and "* * * the wellbeing of its society * * *", as well as "* * * to its conceptions of public morality and decency * * *". As Louisiana's Courts would hold, so must we.

For these reasons, the motion to dismiss will be granted, and the suit will be dismissed.

Proper decree should be presented for signature.